62 F.3d 1425
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Michael Nosakhare OMOREGBEE, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 93-70883.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 15, 1995.
Decided Aug. 3, 1995.
 
 Before: HUG, ALARCON, and TROTT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Michael Nosakhare Omoregbee ("Omoregbee") petitions for review of the Board of Immigration Appeals' ("BIA") denial of his application for asylum, his application to withhold deportation, and his motion to remand to apply for suspension of deportation. Omoregbee raises the following issues in this appeal:
 
 
 3
 1. His testimony was sufficient to support his claim of persecution;
 
 
 4
 2. This court must accept his testimony as credible because the BIA did not expressly find that his testimony lacked credibility;
 
 
 5
 3. The BIA denied his application for asylum and for withholding of deportation based on its erroneous notion that a petitioner's testimony is not sufficient to establish past persecution, and a well-founded fear of future persecution, unless it is corroborated; and
 
 
 6
 4. The BIA erred by requiring him to demonstrate he was persecuted solely because of his political opinions.
 
 
 7
 Omoregbee also maintains that the BIA erred in denying his motion to remand because it failed to consider the psychological hardship he will suffer if deported to Nigeria.
 
 
 8
 We affirm the denial of Omoregbee's application for asylum, and for withholding of deportation, because he failed to fulfill his burden of establishing, by credible evidence, that he was persecuted by the government of Nigeria, that he has a well-founded fear of persecution, or that there is a clear probability that he will be persecuted for his political opinions. We also affirm the denial of Omoregbee's motion to remand because Omoregbee failed to demonstrate that he will experience extreme hardship if he is deported.
 
 
 9
 The Immigration and Naturalization Service does not argue, nor did the BIA conclude, that Omoregbee's testimony, if credible, was insufficient to demonstrate past persecution, a well-founded fear of persecution, or a clear probability that he will be persecuted if he is deported to Nigeria. The dispositive issue in this matter is whether the record contains substantial evidence to support the BIA's express and implied findings that Omoregbee failed to meet his burden of proof and persuasion with credible evidence. Before setting forth our analysis of the issues raised in this petition for review, we summarize the proceedings before the immigration judge ("IJ") and the BIA, and the evidence in the record.
 
 I.
 PROCEEDINGS BEFORE THE IJ AND THE BIA
 
 10
 Omoregbee, a citizen of Nigeria, was admitted to this country as a nonimmigrant visitor on September 14, 1985. On August 7, 1989, the Immigration and Naturalization Service ("INS") initiated deportation proceedings.
 
 
 11
 On October 12, 1989, Omoregbee appeared before an IJ. Omoregbee admitted that he had remained in the United States after his visa expired, and conceded deportability. On that same date, he also applied for asylum and for withholding of deportation. On January 26, 1990, the IJ denied his request and granted him two months in which to depart voluntarily.
 
 
 12
 Omoregbee appealed to the BIA for a reversal of the denial of his application for asylum and for withholding of deportation. He also filed a motion to remand the matter to the IJ in order to apply for suspension of deportation, and to submit new evidence in support of his application for asylum and for withholding of deportation. On October 15, 1993, the BIA dismissed Omoregbee's appeal and denied his motion to remand. On November 8, 1993, Omoregbee filed the instant petition for review of the BIA's order.
 
 II.
 EVIDENCE IN THE RECORD
 
 13
 Omoregbee's version of the events supporting his asylum claim is contained in the information he submitted in his application for asylum, his affidavits in support thereof, and his testimony before the IJ. Omoregbee's father, Alex Omoregbee, holds the title of tribal chieftain of the township of Ekigbo. Alex Omoregbee was the Secretary to the Ministry of Education in Nigeria from 1960 through 1968. He was also a member of the Executive Council of the National Party of Nigeria ("NPN"). The NPN opposed military control of the government. In 1979, after thirteen years of military rule, the NPN was elected to power.
 
 
 14
 From 1980 until December 31, 1983, Alex Omoregbee was a member of the Bendel State Council. In 1981, Alex Omoregbee was selected to be a federal contractor. He was awarded contracts to construct federal universities and the new federal capital at Abuja.
 
 
 15
 Omoregbee shared his father's political opinions concerning the separation of church and state, civilian control of the government, and the rights of southern Christians. Omoregbee openly advocated these same views as a member of the National Student Union ("NSU").
 
 
 16
 On December 31, 1993, General Mohammad Buhari seized control of the government in a military coup. Omoregbee's affidavit states that "[t]he new military government was committed to purging those civic leaders whom it believed were corrupt in office as well as contractors who had inflated the costs of construction on government bids." According to Omoregbee, "[t]he military believed that there was a gross inflation of contracts awarded to top party supporters for construction of federal projects and the new federal capital [sic]...." One senior Nigerian economist reported that about 40 percent of government revenues was embezzled or diverted to pay inflated fees to contractors who paid off corrupt officials. On January 3, 1984, the military government prohibited student assemblies.
 
 
 17
 Omoregbee's father was arrested on January 6, 1984. Alex Omoregbee was charged with abuse of office as a state council member. When Alex Omoregbee appeared at court proceedings in March of 1984, he had cuts and stitches on his right ear and temple. His face was bruised and his left eye was bloodied. After the court proceedings, Alex Omoregbee was taken to a military hospital.
 
 
 18
 Omoregbee visited his father in the military hospital on September 3, 1984. Omoregbee was arrested in his father's hospital room by four military officers. The record is silent as to the ostensible basis for the arrest. Omoregbee testified that upon his arrival at a military base, he was beaten until he lost consciousness. Subsequently, both Omoregbee and his father were released from custody. No final judgment was rendered against Alex Omoregbee in connection with his January 6, 1984 arrest. Omoregbee was released pending further investigation.
 
 
 19
 The government banned the NSU on January 16, 1984. Nevertheless, Omoregbee continued to attend clandestine NSU meetings. Omoregbee published an article in March of 1985 that strongly criticized the military government, called for civilian rule, and advocated resolution of the differences between the Christians who live in the south and the Muslims who live in the northern part of Nigeria. Omoregbee testified that military personnel beat a student at Kaduna State University who was distributing his article.[1] This conduct precipitated a nationwide student strike. As a result of the strike, the military was ordered to arrest all of the NSU student leaders, including Omoregbee.
 
 
 20
 Omoregbee attended an NSU assembly at Ahmadu Bello University in May of 1985. According to Omoregbee, "Muslim fanatics ... pulled out automatic weapons from under their traditional Moslem garb ... and proceeded to machine gun down people on the podium and students in the assembly." Approximately 718 persons died as a result of wounds received in this assault. The government blamed the assembly participants for the bloodbath. Omoregbee escaped without injury, although his name was "prominent on the list of the student leaders wanted by the government."
 
 
 21
 Another military coup occurred on August 28, 1985. General Mohammad Buhari was overthrown by General Ibrahim Babangida. On August 27, 1985, as Alex Omoregbee drove to his residence, he was arrested. Shortly after Alex Omoregbee's arrest, Lieutenant Colonel Sanuie Nasarowa, a family friend, arrived at the Omoregbee residence. Lt. Col. Nasarowa informed Omoregbee that his father had been arrested and that an order had been issued for Omoregbee's arrest. Lt. Col. Nasarowa urged Omoregbee to flee from Nigeria.
 
 
 22
 Omoregbee was arrested by military personnel after Lt. Col. Nasarowa left the residence. He was whipped, beaten, and tortured. Three days later, Lt. Col. Nasarowa visited Omoregbee in the hospital, where he had been taken for treatment. Lt. Col. Nasarowa informed Omoregbee that he would be charged with conspiring with his father in abusing his public office by inflating construction costs on government projects. Lt. Col. Nasarowa also told Omoregbee that the military planned to murder Omoregbee because of his father's opposition to military rule in a poll of public officials conducted in 1975.
 
 
 23
 On August 30, 1985, Lt. Col. Nasarowa helped Omoregbee escape from the hospital. He provided Omoregbee with a disguise and $11,000.00. Lt. Col. Nasarowa secured a hiding place for Omoregbee, and helped him to obtain a visitor's visa to enter the United States. Omoregbee entered the United States on September 14, 1985.
 
 
 24
 In January of 1988, Alex Omoregbee was convicted of conspiracy, purposefully increasing labor costs, and abuse of office. He is currently serving a 63-year prison term at Ikeja Maximum Security Prison.
 
 
 25
 Omoregbee's mother must report to the police station five days a week. She is prohibited from travelling outside of the state of Bendel in Nigeria. Omoregbee alleged that his uncle, David Omoregbee, was "mistakenly killed because he looked exactly like" Omoregbee's father. Omoregbee's godmother, Grace Esoghare, was killed by unknown assailants in March of 1984. Omoregbee alleged that "[h]er death is attributed to the same pro-military group because she was a close associate and fellow federal contractor of my father."
 
 
 26
 Omoregbee introduced affidavits signed by his mother, sister, a friend, and a fellow student, to support his asylum application. None of these affidavits contain allegations that Omoregbee and his father were persecuted for their political opinions.
 
 
 27
 Omoregbee also offered as evidence his student identification card and photographs depicting scars on portions of his body. The student identification card sets forth his name, academic department, and an expiration date. It does not contain any reference to his alleged affiliation with the NSU.
 
 
 28
 The photographs depict scars on his left armpit, right forearm, and genitals. They do not contain the likeness of the person or persons who allegedly inflicted the injuries, nor do they reveal when or where they were sustained.
 
 
 29
 Omoregbee submitted newspaper and journal articles, as well as reports published by Amnesty International, which contain general background information regarding the political situation in Nigeria. None of these publications refer to Omoregbee or his father.
 
 
 30
 In opposition to Omoregbee's application for asylum and for withholding of deportation, the Government presented the Country Reports on Human Rights Practices for 1988. This report contains general historical information regarding the political climate in Nigeria. It notes that in 1988, there were few long term political detainees in Nigeria. This report does not contain any reference to Omoregbee or his family.
 
 III.
 
 31
 SUFFICIENCY OF THE EVIDENCE REGARDING OMOREGBEE'S ASYLUM APPLICATION
 
 
 32
 Omoregbee contends that the BIA erroneously concluded that he did not present sufficient evidence to establish that he was subjected to persecution prior to leaving Nigeria, or that he has a well-founded fear of future persecution if he is deported.
 
 
 33
 The Attorney General, in his or her discretion, has the authority to grant asylum to an alien who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" 8 U.S.C. Sec. 1101(a)(42)(A) (1988).
 
 
 34
 The well-founded fear standard is less burdensome than the clear probability standard, which must be established for withholding of deportation. INS v. Cardoza-Fonseca, 480 U.S. 421, 425 (1987). The Supreme Court has instructed that the well-founded fear standard does not require the applicant to prove that persecution is "more likely than not" to occur. Id. at 431. The applicant is required only to show that " 'persecution is a reasonable possibility.' " Id. at 440 (quoting INS v. Stevic, 467 U.S. 407, 424-25 (1984)).
 
 
 35
 We have stated that the well-founded fear standard has both a subjective and an objective component. Shirazi-Parsa v. INS, 14 F.3d 1424, 1427 (9th Cir.1994). "The subjective component may be satisfied by 'an applicant's credible testimony that he genuinely fears persecution.' " Id. (emphasis added) (citations omitted). The objective component requires " 'credible, direct, and specific evidence' of facts supporting a reasonable fear of persecution[.]" Id. (emphasis added) (citations omitted). Although both prongs require the applicant's testimony to be credible, the objective prong further requires
 
 
 36
 the alien to substantiate his claim of past or anticipated future persecution with objective facts. These may be established through documentary evidence, or lacking that, the alien's own testimony, "if it is credible, persuasive, and refers to specific facts that give rise to an inference that [he or she] has been or has a good reason to fear that he [or she] ... will be singled out for persecution[.]"
 
 
 37
 Ramos-Vasquez v. INS, No. 93-70837, slip op. 7037, 7046 (9th Cir. June 16, 1995) (citations omitted).
 
 
 38
 "We review BIA decisions denying asylum under a two-tier standard." Sanchez-Trujillo v. INS, 801 F.2d 1571, 1578 (9th Cir.1986). First, we review the BIA's factual findings, including whether the alien has demonstrated past persecution, or a well-founded fear of persecution, under the "substantial evidence" standard. Kotasz v. INS, 31 F.3d 847, 851 (9th Cir.1994). The BIA's findings cannot be overturned unless the alien's evidence "was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." INS v. Elias-Zacarias, 502 U.S. 478, 484 (1992). Second, if we determine that the alien's evidence was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution, "we review the BIA's ultimate denial of asylum for an abuse of discretion." Sanchez-Trujillo, 801 F.2d at 1578. We must examine the totality of the circumstances to determine whether the applicant has stated a valid claim for asylum. Shirazi-Parsa, 14 F.3d at 1427.
 
 
 39
 Omoregbee's contention that the BIA concluded that his testimony was insufficient to support a claim for asylum mischaracterizes the BIA's ruling. Neither the BIA nor the IJ found that his testimony, if credible, would have been insufficient to demonstrate past persecution or a well-founded fear of persecution. Instead, after reviewing Omoregbee's testimony, and the additional evidence he produced in support of his claim of past persecution, the BIA determined that Omoregbee failed to present sufficient credible evidence to sustain his burden of proof and persuasion to establish past persecution, or that he has a well-founded fear of future persecution if he returns to Nigeria.
 
 
 40
 We review the IJ and BIA's credibility findings for substantial evidence. Ramos-Vasquez, No. 93-70837, slip op. at 7043. The law of this circuit regarding the effect of the BIA's credibility findings, or the lack thereof, can be summarized as follows. If there are no credibility findings in the record, "we will presume that the Board found the petitioner credible[ ]" and proceed to review the Board's decision. Canjura-Flores v. INS, 784 F.2d 885, 889 (9th Cir.1985). "We must defer to an immigration judge's express and implied findings that the alien's testimony is not credible if the record supports such findings." Saballo-Cortez v. INS, 761 F.2d 1259, 1266 (9th Cir.1985) (emphasis added). Inconsistencies in a petitioner's testimony regarding trivial facts do not constitute "a valid ground upon which to base a finding that an asylum applicant is not credible." Damaize-Job v. INS, 787 F.2d 1332, 1337 (9th Cir.1986).
 
 
 41
 There were numerous material and significant inconsistencies between Omoregbee's version of the events that he asserts support his persecution claim, and the documentary evidence he provided in support of his application. Omoregbee testified that he was arrested for his political views and his conduct as a member of the NSU. Omoregbee's mother, sister, and fellow student alleged, however, that Omoregbee was wanted for helping his father during 1979-1983, and possibly for helping his father escape from his military cell. These affidavits do not specify whether the help Omoregbee provided to his father was as an aider and abettor of his father's allegedly corrupt conduct as a government contractor.
 
 
 42
 Assisting a person in escaping from prosecution for corrupt conduct is undoubtedly a violation of Nigeria's penal statutes. Omoregbee does not dispute that Nigeria has the right to prosecute an individual for violating its laws. See Abedini v. INS, 971 F.2d 188, 191 (9th Cir.1992) (an alien's claim of potential prosecution for violating a law in his or her country, is not sufficient to establish that he or she has a well-founded fear of future persecution on account of his or her political opinion). It appears from the record that the Nigerian government believed that Omoregbee's father was guilty of corrupt conduct. Since Alex Omoregbee transferred title to his properties to Omoregbee,[2] it would appear that the Nigerian government had reasonable cause to believe that Omoregbee may have participated in concealing his father's assets to avoid a restitution order. The Nigerian government clearly would have probable cause to prosecute Omoregbee if he helped his father escape from a military cell to avoid criminal prosecution for corrupt conduct.
 
 
 43
 Omoregbee's sister and fellow student allege in their affidavits that there were two nationwide student strikes in November of 1984 and in August of 1985. Omoregbee testified that the nationwide student strike took place in March of 1985. The affidavits submitted by Omoregbee's sister and fellow student make no reference to a nationwide student strike in March of 1985, or to the article published by Omoregbee.
 
 
 44
 The allegations in the affidavits signed by Omoregbee's mother, sister, and fellow student are virtually identical, including punctuation errors and typographical format. This factor undoubtedly depreciated their persuasive value in demonstrating an objective basis for a well-founded fear of persecution, and in providing support for Omoregbee's factual assertions.
 
 
 45
 The BIA found that the documentary evidence submitted by Omoregbee was "at odds" with Omoregbee's account of the events which he claims transpired on the night of the second coup. The documentary evidence submitted by Omoregbee indicates that the ouster of General Buhari occurred after one of the most peaceful takeovers in the continent's history. Following the takeover, all known prisoners of conscience with the exception of one person were released, the cases of an estimated 500 political detainees who had been jailed under General Buhari's regime were reviewed, a law banning criticism of the government was repealed, a prominent human rights advocate was named Attorney General, and General Babangida promised to cure the excesses of the secret police.
 
 
 46
 A. Absence of a plausible explanation for Omoregbee's failure to present material evidence
 
 
 47
 The record shows that Omoregbee did not provide a plausible explanation for his failure to submit certain material evidence in support of his claim. Although it is difficult for many aliens to provide supporting documentation, Omoregbee was able to obtain several affidavits from his family, a friend, and a fellow student who still reside in Nigeria.
 
 
 48
 It is beyond dispute that the applicant bears the burden of submitting persuasive evidence of past persecution and a well-founded fear of future persecution. Shirazi-Parsa, 14 F.3d at 1427. Applicants for asylum should submit supporting evidence if available, and should make every effort to obtain such evidence. Matter of Mogharrabi, 19 I. & N. Dec. 439, 445 (BIA 1987); Matter of Dass, 20 I. & N. Dec. ---- (Int.Dec. No. 3122,
 
 
 49
 at * 3) (BIA 1989). If supporting evidence is not available, the applicant must give a satisfactory explanation for the absence of the evidence. Id.
 
 
 50
 Further, it is a well recognized legal principle that a litigant's failure to produce relevant evidence that is available to him or her gives rise to an inference that the evidence would be unfavorable to that party. United States v. Tory, 52 F.3d 207, 211 (9th Cir.1995); see also Matter of Dass, Int.Dec. No. 3122, at * 4 (where there are significant, meaningful evidentiary gaps, applications for asylum and for withholding of deportation will ordinarily have to be denied).
 
 
 51
 As noted above, the evidence submitted by Omoregbee in support of his claim for asylum casts serious doubt on his credibility concerning material and significant aspects of his testimony regarding prior acts of persecution.
 
 
 52
 During the deportation proceedings, Omoregbee was asked to explain why neither he nor his father was mentioned in any of the publications he submitted in support of his claim of past persecution. Omoregbee responded that "southerners are not prominent [in] Nigerian politics." He also stated that "people in the Amnesty International ... are northerners ... they are Moslems." It appears that Omoregbee wanted the IJ to infer that Amnesty International is controlled by northern Nigerians who are prejudiced against southern Nigerians. No facts were offered by Omoregbee to support his testimony that a multinational organization such as Amnesty International would omit significant examples of human rights violations because it is controlled by northern Nigerians or because its members are prejudiced against southern Nigerians.
 
 
 53
 The IJ noted that although Omoregbee submitted numerous publications dealing with Nigerian history, none of the journals mention Omoregbee or his father who were "putatively major players in that history." The IJ stated that he found "inherently incredible [Omoregbee's] explanation that he and his father were not noted by Amnesty International because that organization is controlled by northern Nigerians who are prejudiced against southern Nigerians and therefore would not mention prisoners of conscience or political detainees who were members of southern tribes." We can infer from the quoted language that the IJ believed that the arrest and persecution of a member of the Executive Council of the NPN, and the former Secretary to the Ministry of Education, would have been reported by Amnesty International if it were true.
 
 
 54
 As set forth above, Omoregbee testified that 718 persons were slaughtered at a student meeting in May of 1985. None of the documentary evidence Omoregbee submitted in support of his application mentions this event. Instead, the New York Times reported a massacre that occurred in 1984 when an Islamic sect broke out of jail and killed 718 persons in Jimeta. The BIA was free to conclude that Omoregbee fabricated his account of the alleged student massacre in 1985 of an identical number of persons in an attempt to persuade the IJ that his application for asylum should be granted.
 
 
 55
 The BIA found that Omoregbee's statement that Amnesty International would not report this massacre because it occurred in the south, was not a "plausible explanation" for his inability to provide documentary evidence that this event occurred. The BIA also found it "incredible" that the massacre of approximately 718 student leaders in 1985 would not be considered worthy of mention by any news organization, when the killing of four students a year later was reported by the New York Times and Amnesty International.
 
 
 56
 Omoregbee maintains that a plausible explanation for his inability to present documentary evidence regarding the massacre of 718 students is that the military had placed restrictions on the freedom of the press. This rationalization is unpersuasive in light of the fact that the New York Times and Amnesty International reported other killings that occurred both before and after the alleged slaughter of 718 students in May of 1985.
 
 
 57
 Omoregbee testified that he was persecuted as the result of the publication of his student article. The record, when viewed as a whole, casts doubt on Omoregbee's testimony that he wrote an article, or that there was a nationwide strike following its distribution.
 
 
 58
 The BIA found it "incredible" that a nationwide strike of students would not be mentioned by Amnesty International or some other news organization. Omoregbee testified that he was unable to produce a copy of the article because he fled Nigeria after approximately two weeks in hiding. The record shows that Omoregbee has family and friends in Nigeria who prepared affidavits in support of his amnesty claim. None of these affiants, however, mention Omoregbee's student article, nor do they allege that its publication incited a nationwide student strike. Omoregbee failed to explain why his family and friends could not obtain a copy of his article.
 
 
 59
 Omoregbee also failed to submit an affidavit from Lt. Col. Nasarowa. Omoregbee testified that Lt. Col. Nasarowa would submit an affidavit in support of his application for asylum and for withholding of deportation. Omoregbee did not explain his failure to submit an affidavit from the witness most capable of providing facts to demonstrate that Omoregbee has a well-founded fear that he will be persecuted for his political opinions.
 
 
 60
 In sum, in view of the entire record, substantial evidence supports the BIA's conclusion that Omoregbee failed to fulfill his burden of presenting credible evidence of facts supporting his application for asylum. Shirazi-Parsa, 14 F.3d at 1427.
 
 IV.
 
 61
 THE BIA'S EXPRESS AND IMPLIED CREDIBILITY FINDINGS
 
 
 62
 Omoregbee maintains that he is entitled to review and a reversal of the BIA's order because neither the BIA nor the IJ made an "explicit finding concerning ... Omoregbee's credibility." This contention is devoid of merit. Under the law of this circuit, "we must defer to an immigration judge's express and implied findings that the alien's testimony is not credible if the record supports such findings." Saballo-Cortez, 761 F.2d at 1266 (emphasis added).
 
 
 63
 Omoregbee cites Bolanos-Hernandez v. INS, 767 F.2d 1277 (9th Cir.1985), and Canjura-Flores v. INS, 784 F.2d 885 (9th Cir.1985), to support his contention that the lack of an express finding regarding credibility requires us to presume that the IJ and the BIA found his entire testimony to be credible. Omoregbee's reliance on Bolanos-Hernandez and Canjura-Flores for this proposition is misplaced.
 
 
 64
 In Bolanos-Hernandez, 767 F.2d 1277, we expressly noted that neither the IJ nor the BIA questioned the applicant's credibility as to any issue, or expressed any doubt regarding his testimony that specific threats had been made against his life. Id. at 1284. Further, in Canjura-Flores, 784 F.2d 885, the INS conceded that neither the IJ nor the BIA found that any portion of the applicant's testimony was not credible. Id. at 888. In contrast, in this action, although neither the IJ nor the BIA made an explicit finding that Omoregbee's entire testimony was not credible, both the IJ and the BIA found expressly and impliedly that material and significant portions of Omoregbee's testimony were not believable in light of other evidence in the record.
 
 
 65
 The IJ and the BIA found that Omoregbee's testimony was not credible regarding key events that he relied upon in support of his application for asylum. The BIA expressly found that Omoregbee and his father were arrested because of corrupt conduct in making fraudulent claims regarding government contracts, rather than because of their political opinions. The BIA did not believe Omoregbee's testimony that 718 students were massacred at Ahmadu Bello University by surrogates of the military. The BIA found that Omoregbee's testimony that he published an article which sparked a nationwide student strike was not credible. Substantial evidence supports the BIA's express and implied findings that Omoregbee's testimony was not credible as to significant portions of his claim of alleged acts of persecution.
 
 V.
 CORROBORATION
 
 66
 Omoregbee asserts that the BIA denied his appeal because it erroneously concluded that a petitioner seeking asylum or withholding of deportation cannot obtain relief from deportation unless his testimony is corroborated. Relying on our decision in Bolanos-Hernandez, 767 F.2d 1277, Omoregbee correctly notes that refugees are rarely able to present independent corroborating evidence because persecutors are not likely to provide affidavits attesting to their acts of persecution. Id. at 1285. He also reminds us that an applicant's uncorroborated testimony, if credible, may be sufficient to establish a well-founded fear of persecution. Id.
 
 
 67
 The record of the deportation proceedings demonstrates that the IJ was mindful of the principle that corroboration of the petitioner's testimony is not required. The IJ began his order by stating: "I am well aware that the courts and the Board of Immigration Appeals have held that the uncorroborated testimony of a respondent may be sufficient to establish a claim for asylum[.]" Further, the BIA commented that an alien's own testimony is sufficient to uphold an order granting asylum or withholding of deportation if the testimony is "believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis for his alleged fear."
 
 
 68
 We have stated that the "existence or non-existence of corroborating evidence is a factor which can be considered" by the BIA in making its determinations. Canjura-Flores, 784 F.2d at 889. The BIA found that based upon the entire record, Omoregbee failed to fulfill his burden of demonstrating, by credible evidence, that he was subjected to prosecution in the past or that he has a well-founded fear of renewed persecution if he is deported to Nigeria. Omoregbee's contention that the BIA rejected his appeal solely because his testimony was not corroborated has no merit.
 
 VI.
 
 69
 PERSECUTION BASED SOLELY UPON OMOREGBEE'S POLITICAL OPINIONS
 
 
 70
 Omoregbee also argues that the BIA erred because it erroneously required him to show that his political opinion was the sole reason for his persecution claim. Omoregbee contends that "even if the military regime was motivated in part by a desire to prosecute the Omoregbee family[,] the record compels the conclusion that the regime was also motivated to persecute Mr. Omoregbee because of his and his father's political opinions."
 
 
 71
 As discussed above, the BIA found that Omoregbee failed to fulfill his burden of establishing with credible evidence that he experienced persecution because of his and his father's political views. In fact, most of Omoregbee's documentary evidence undercuts this assertion. To reverse the BIA's determination, Omoregbee must show that the totality of the "evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." Elias-Zacarias, 502 U.S. at 484. The record supports the BIA's credibility findings. Omoregbee has not demonstrated with credible evidence that no reasonable factfinder could fail to find that he was persecuted in Nigeria.
 
 VII.
 WITHHOLDING OF DEPORTATION
 
 72
 Omoregbee also petitioned for review of the denial of his application to withhold deportation, pursuant to 8 U.S.C. Sec. 1253(h) (1988). To qualify for withholding of deportation, the alien must establish a "clear probability of persecution." Stevic, 467 U.S. at 413. The clear probability standard is a heavier burden than the well-founded fear standard. Cardoza-Fonseca, 480 U.S. at 423.
 
 
 73
 Because Omoregbee has failed to satisfy his burden of establishing a well-founded fear of persecution, it necessarily follows that he has failed to meet the more stringent standard of establishing a clear probability of persecution to warrant withholding of deportation. Rodriguez-Rivera v. INS, 848 F.2d 998, 1007 (9th Cir.1988).
 
 VIII.
 MOTION TO REMAND
 
 74
 Omoregbee challenges the denial of his motion to remand to apply for suspension of deportation under 8 U.S.C. Sec. 1254(a)(1) (1988), on the following bases: 1) the BIA failed to consider "the psychological hardship and mental anguish he would experience as a torture victim returning to the site of his torture[;]" and 2) the BIA failed to address Dr. Roth's opinion that Omoregbee suffers from Post Traumatic Stress Syndrome and returning to Nigeria would be a significant hardship for him.
 
 
 75
 The requirements of a motion to remand are essentially the same as those for a motion to reopen. Rodriguez v. INS, 841 F.2d 865, 867 (9th Cir.1987). The Supreme Court has held that the granting of a motion to reopen is discretionary and is disfavored. INS v. Doherty, 112 S.Ct. 719, 724 (1992). The BIA may deny a motion to reopen based upon the movant's failure to establish a prima facie case for the relief sought. Id. at 725.
 
 
 76
 It is undisputed that Omoregbee has been physically present in the United States for the requisite time period and that he is a person of good moral character. See 8 U.S.C. Sec. 1254(a)(1). Therefore, we must decide whether Omoregbee presented a prima facie case that he will suffer extreme hardship if he is deported to Nigeria. The determination whether Omoregbee will suffer extreme hardship if deported to Nigeria is a matter that is also committed to the discretion of the BIA. See INS v. Wang, 450 U.S. 139, 140 (1981) (The BIA has the discretion to suspend deportation and adjust the status of an otherwise deportable alien, under 8 U.S.C. Sec. 1254(a)(1)). Accordingly, the BIA had "discretion piled on discretion" when it decided Omoregbee's motion to remand. Achacoso-Sanchez v. INS, 779 F.2d 1260, 1263 (7th Cir.1985). An alien who fails to establish a well-founded fear of persecution, or a clear probability of persecution, cannot claim persecution as an example of extreme hardship. Kashefi-Zihagh v. INS, 791 F.2d 708, 710 (9th Cir.1986); Matter of Kojoory, 12 I. & N. Dec. 215, 219-20 (BIA 1967). The BIA does not abuse its discretion in ruling that an applicant has not established a prima facie claim of extreme hardship as long as it "state[s] its reasons and show[s] proper consideration of all factors when weighing equities and denying relief." Hassan v. INS, 927 F.2d 465, 467 (9th Cir.1991) (citations omitted).
 
 
 77
 The record does not support Omoregbee's assertion that the BIA failed to address his contention regarding the psychological impact of returning to Nigeria or the statements contained in Dr. Roth's report. The BIA's order states
 
 
 78
 [Omoregbee] asserts that his deportation to Nigeria will be injurious to his psychological health, and he has submitted a physician's report indicating that he develops symptoms of post traumatic stress disorder when reminded of the possibility of his deportation to Nigeria. While we acknowledge the hardship that may be experienced by [Omoregbee] due to the severance of social and professional ties and the psychological stress of returning to a country which is currently under military rule and does not afford full political freedoms to its citizens, we find that these factors do not establish a prima facie case of "extreme" hardship.
 
 
 79
 The Board has the "authority to construe 'extreme hardship' narrowly[.]" Id. (citations omitted).
 
 
 80
 The quoted language demonstrates that the BIA addressed Omoregbee's claim that his deportation to Nigeria would have an adverse psychological impact on him. The BIA determined that this was not sufficient to establish extreme hardship. We have previously held that the following do not constitute extreme hardship: economic disadvantage; the severance of professional and social ties; the emotional hardship of deportation; the difficulty of readjusting to life in a different country; or the difficulty of returning to a country that has a lower standard of living. See Patel v. INS, 638 F.2d 1199, 1206 (9th Cir.1980) (economic disadvantage and severance of community ties do not establish extreme hardship); Hassan, 927 F.2d at 468 (emotional hardship of returning to native country does not establish extreme hardship); Ramirez-Durazo v. INS, 794 F.2d 491, 498 (9th Cir.1986) (lower standard of living in alien's country and difficulty of readjustment do not establish extreme hardship). The BIA did not abuse its discretion in denying Omoregbee's motion to remand to apply for suspension of deportation.
 
 
 81
 The petition for review is DENIED.
 
 
 82
 HUG, Circuit Judge, dissenting.
 
 
 83
 I respectfully dissent.
 
 
 84
 There is no doubt that the detention, torture, and persecution related by the petitioner would cause a reasonable person in the petitioner's circumstances to fear persecution if he is returned to Nigeria. The BIA never made a finding that it was denying asylum because the persecution he related was incredible. Rather, it picked on minor inconsistencies and lack of confirming substantiation, although recognizing the difficulty aliens have in producing substantiation. Only if his story of arrests, beatings and torture are completely disbelieved can this result be justified. Here we have a man who has been in this country for ten years contributing to our society as a responsible person, who the BIA finds to be of good moral character, yet his testimony is entirely discredited. The facts he relates clearly qualify him as a refugee with a well-founded fear of persecution. This is the very type of person the asylum statute is designed to protect. To deprive this person of the intended benefits of the statute on the basis of this record is a travesty and I must dissent.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The BIA's order indicates that the beatings occurred at Ahmadu Bello University. Additionally, Omoregbee's brief indicates that military personnel beat students who were distributing his article. During Omoregbee's testimony, however, he stated that only one student was beaten while distributing his article
 
 
 [2]
 Omoregbee's affidavit indicates that the following properties were transferred to him by his father, and are currently held in his name: four houses; a gas station; a building complex; and rubber, cocoa, palm oil, and pineapple plantations