**Masood SHIRAZI–PARSA; Georgina Shirazi–Parsa, Petitioners,**

**v.**

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

**No. 92–70336.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 5, 1993.

Decided Feb. 1, 1994.

Robert A. Mautino, San Diego, CA, for petitioners.

William J. Howard, U.S. Dept. of Justice, Washington, DC, for respondent.

Before: FLETCHER and NELSON, Circuit Judges, and WILL,* Senior District Judge.

D.W. NELSON, Circuit Judge:

Petitioner,[1] Masood Shirazi–Parsa, and his wife, Georgina Shirazi–Parsa, petition this court for review of a final order of the Board of Immigration Appeals ("BIA" or "Board") that denied their request for asylum pursuant to 8 U.S.C. § 1158(a) but granted them voluntary departure under 8 U.S.C. § 1254(e).[2] We reverse the decision of the Board and remand for further proceedings.

**I. Factual and Procedural Background**

Masood Shirazi–Parsa is a native and citizen of Iran. His wife, Georgina, is a native

---

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, sitting by designation.

1. The application of Georgina Shirazi–Parsa is derivative of that of her husband. *See* 8 C.F.R. § 208.2 (1990). Thus, her request for asylum and withholding of deportation can be granted only if her husband's is granted first. *See Young v. INS*, 759 F.2d 450, 456 n. 8 (5th Cir.), *cert.*

*denied*, 474 U.S. 996, 106 S.Ct. 412, 88 L.Ed.2d 362 (1985). Consequently, our analysis focuses on the experiences of Masood Shirazi–Parsa alone.

2. The Board also denied Petitioner's request for withholding of deportation under 8 U.S.C. § 1253(h)(1). Petitioner does not challenge this ruling on appeal.

and citizen of Mexico. They met while students in the United States, and, in 1982, moved to Iran and married. Georgina Shirazi–Parsa made three trips to the United States during the course of their marriage. The first, in 1983, was to give birth to their daughter; the second occurred in 1985 when her husband was drafted into the Iranian army. The third and final trip, Petitioner contends, was occasioned by a series of events that occurred about August 1988. The couple was invited to dinner at an army officer's home. During the course of the evening, Georgina became very upset when the officer's wife made insulting remarks about Georgina's Mormon religion. Petitioner and his wife testified that the following night the Revolutionary Guard came to their home, seized Masood, beat him, questioned him concerning his wife's employment at the Argentine Embassy, their contacts with Argentine soldiers attached to the United Nations, and his wife's religion, and accused him of being a spy. Petitioner and his wife further testified that, prior to these incidents, he had been interrogated weekly on each of these subjects while in the army. After this incident, Georgina left Iran for Mexico, later entering the United States about January 1989 with a tourist visa. Masood remained in Iran; he fled after receiving a letter from a prosecutor that ordered him to appear at the appropriate office but did not specify any charges.[3] After travelling through Turkey to Mexico (where he was denied asylum because of his inability to meet the Mexican government's requirement that he be able to start a business capitalized at $200,000), Masood entered the United States without inspection in January 1989.

Petitioner applied for asylum and withholding of deportation under 8 U.S.C. §§ 1158(a) & 1253(h)(1) in March 1989, asserting that he would be "imprisoned by the regime, and perhaps, tortured and killed" because of his and his wife's political and religious beliefs. Petitioners conceded deportability. On April 11, 1991, after a hearing, the Immigration Judge (IJ) denied Petitioner's requests, but granted him and his wife voluntary departure under 8 U.S.C. § 1254(e). The IJ found that Petitioner had failed to satisfy his burden of demonstrating a "well-founded" fear of political or religious persecution. The IJ concluded that although Petitioner relied heavily on his receipt of a summons from the Iranian authorities to explain his sudden departure from Iran, he had failed to advance a plausible reason for failing to produce it. Petitioner also testified that he feared reprisals because of his father's membership in the SAVAK, the Shah's intelligence service, his own connections with the SAVAK while a student in the United States, and his brother's troubles with the regime. However, because Petitioner's father had lived unmolested in Iran for a number of years and because there was no evidence that the authorities had ever interrogated Petitioner concerning any of these subjects, the IJ found any fear of persecution based on them implausible.

Petitioner appealed to the BIA, which denied his petition and affirmed the IJ in an opinion dated April 22, 1992. The Board did not rely on Petitioner's inability to produce the summons, but found that the regime's interest in him was not on account of his religious or political views. Focusing on the specific questions asked during Masood's interrogations, the Board concluded that the regime merely believed Masood to be a spy. As for the summons, the Board noted that it contained no charges. Consequently, the Board reasoned that "even taken in conjunction with the prior inquiries and the [dinner] incident, [it did not] provide a reasonable basis for fearing persecution *on account of* religion or any of the other enumerated grounds." Admin.Rec. at 7 (emphasis added). Finally, the Board agreed with the IJ that it was implausible that Masood would be persecuted for his or his father's SAVAK · connections or his brother's troubles with the regime.

Petitioner subsequently filed a timely petition for review under 8 U.S.C. § 1105a(a)(1), and now makes three arguments. First, that the Board must be reversed because the IJ

---

**3.** The testimony is unclear whether this occurred two weeks or a month and a half following the dinner and abduction incidents.

impermissibly relied on Petitioner's inability to produce the summons. Second, that the Board erred by failing to take administrative notice of several State Department reports that detailed the general pattern of "political" arrests and consequent persecution engaged in by the Iranian regime. Third, that the Board's finding that Petitioner does not possess a well-founded fear of political or religious persecution lacks substantial evidence to support it because the BIA failed to consider the cumulative effect of each of the incidents the Petitioner experienced as well as the context provided by the above-mentioned reports. This court has jurisdiction under 8 U.S.C. § 1105a(a).

## II. Applicable Provisions and Standard of Review

Under 8 U.S.C. § 1158(a), the Attorney General has discretion to grant an alien asylum if the alien is determined to be a "refugee." *See* 8 U.S.C.A. § 1158(a) (West 1993). A refugee is defined as any person who is unable or unwilling to return to his or her country of origin "because of persecution or a well-founded fear of persecution on account of ... religion ... or political opinion." *Id.* § 1101(a)(42)(A). As both the IJ and the BIA correctly noted, the "well-founded fear" standard has both objective and subjective components. The subjective component may be satisfied by "an applicant's credible testimony that he genuinely fears persecution." *Acewicz v. INS,* 984 F.2d 1056, 1061 (9th Cir.1993) (citing *Berroteran–Melendez v. INS,* 955 F.2d 1251 (9th Cir.1992)). The objective component "requires a showing by 'credible, direct, and specific evidence' of facts supporting a reasonable fear of persecution" on the relevant ground. *Id.* (quoting *Rodriguez–Rivera v. INS,* 848 F.2d 998, 1002 (9th Cir.1988) (per curiam)). The burden is on the applicant to meet this standard. *See id.;* 8 C.F.R. § 208.5 (1990).

Our review is limited to the BIA's decision. *See Acewicz,* 984 F.2d at 1059; *Charlesworth v. INS,* 966 F.2d 1323, 1325 (9th Cir.1992); *see also Balazoski v. INS,* 932 F.2d 638, 640 (7th Cir.1991) ("We review the decision of the BIA, not the IJ."). Any error committed by the IJ thus "may be

rendered harmless" by the BIA's application of the correct legal standard. *Elnager v. INS,* 930 F.2d 784, 787 (9th Cir.1991). The BIA's opinion, however, cannot be mere "Boilerplate" and must describe "with sufficient particularity and clarity the reasons for denial of asylum." *Castillo v. INS,* 951 F.2d 1117, 1121 (9th Cir.1991).

Factual determinations underlying the Board's denial of asylum are reviewed under the "substantial evidence" standard. *See INS v. Elias–Zacarias,* —— U.S. ——, ——, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992); *Abedini v. INS,* 971 F.2d 188, 191 (9th Cir.1992); 8 U.S.C.A. § 1105a(a)(4) (West 1993). Under this standard, a court must review "the findings by a slightly stricter scrutiny than the clear error standard." *Rodriguez–Rivera,* 848 F.2d at 1001. However, the court "may not reverse the BIA simply because [the court] disagree[s] with its evaluation of the facts." *Id.* " 'All the substantial evidence standard requires is that the BIA's conclusion, based on the evidence presented, be substantially reasonable.' " *Id.* (quoting *Diaz–Escobar v. INS,* 782 F.2d 1488, 1492 (9th Cir.1986)); *accord Arriaga–Barrientos v. INS,* 937 F.2d 411, 413 (9th Cir.1991); *Estrada–Posadas v. INS,* 924 F.2d 916, 918 (9th Cir.1991). Because the burden of proof is on the Petitioner to demonstrate eligibility for asylum, the reviewing court will reverse "only if the evidence presented ... was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Elias–Zacarias,* —— U.S. at ——, 112 S.Ct. at 815; *accord Abedini,* 971 F.2d at 191. The evidence must "not only *support* [ ] ... but *compel* [ ]" this conclusion. *Elias–Zacarias,* —— U.S. at —— n. 1, 112 S.Ct. at 815 n. 1 (emphasis in original). The legal conclusions of the Board are reviewed de novo. *Abedini,* 971 F.2d at 190–91.

## III. Analysis

### A. *Inability to Produce the Summons*

Petitioner asserts that the IJ placed undue emphasis on his inability to produce the summons. However, the BIA expressly denied that "the absence of the actual sum-

mons itself should preclude the respondent from [obtaining] relief." Admin.Rec. at 7 n. 2 (citing *Matter of Mogharrabi*, 19 I. & N. Dec. 439, 445 (BIA 1987)). Indeed, the Board conducted its de novo analysis based on the assumption that the summons contained precisely that which Petitioner contended: his name, the date and location of his appearance, but no specific charges.[4] As this court only reviews the BIA's decision, and not that of the IJ, *see, e.g., Charlesworth*, 966 F.2d at 1325, the IJ's reliance on Shirazi-Parsa's nonproduction of the summons is irrelevant. Therefore, Petitioner's first argument is without merit.

### B. The Board's Failure to Take Administrative Notice

■ Petitioner's second contention is that the BIA should have taken administrative notice of certain State Department reports that detail the nature and frequency of random political arrests and brutal treatment of detainees by government authorities in Iran. Failure to take administrative notice is reviewed under the abuse of discretion standard. *See Paul v. INS*, 521 F.2d 194, 199 (5th Cir.1975).

We find it unnecessary to rule on this matter. First, it is unclear that the Board refused to consider the reports. Although they are not mentioned in the opinion, the Board considered and rejected the broad argument in which they were discussed—that all the incidents when considered together evinced political persecution. Thus, it is most reasonable to conclude that the Board took notice of the reports, but found them unpersuasive. Second, whether or not the Board took administrative notice of the reports, or erred in failing to do so, we choose to exercise our discretion and take *judicial* notice of them. *See Lazo–Majano v. INS*, 813 F.2d 1432, 1435 (9th Cir.1987). As discussed below, we believe that the reports provide the vital context in which Petitioner's claim of political persecution must be evaluated.

### C. The Board's Conclusions Were Not Supported By Substantial Evidence

■ The Board's central conclusion was that Petitioner did not have a well-founded fear of persecution *on account of* political or religious persecution. The Board reasoned that the incidents of interrogation, both those that occurred while Petitioner was in the army and that which followed the dinner dispute, did not evince a political *motive* on the part of the regime, but rather a legitimate concern with espionage. Similarly, although Petitioner's wife's status as a Mormon was mentioned during these incidents, the Board concluded that "[a]ny mention of the Mormon religion during these interrogations appears to be tangential to the main purpose of the interrogations, and not the result of religious persecution by the government." Admin.Rec. at 7. Finally, the Board concluded that because the summons contained no charges "[t]here [was] no evidence indicating why the Revolutionary Guard wanted to speak to [Petitioner], and we note the possibility that it could be for any reason, including those completely unrelated to the respondent's religious status, or the incident at the dinner party." *Id.* Thus, the Board concluded that the summons "even [when] taken in conjunction with the prior inquiries and the [dinner incident could not] provide a reasonable basis for persecution on account of religion or any of the other enumerated grounds." *Id.*

We believe the Board erred in taking this last step: first, by concluding that the summons was unrelated to the prior incidents, and second, by concluding that the cumulative effect of the incidents did not give rise to a well-founded fear of persecution on account of political opinion.[5] Specifically with respect to this second point, by failing to consider the totality of the circumstances, the Board erred in concluding that "any mention of [politics or] religion during [Petitioner's] interrogations appear[ed] tangential" to legitimate espionage-related concerns. Admin.Rec. at 7.

---

**4.** Petitioner testified that the letter contained "[n]o reason why or anything like that."

**5.** Petitioner conceded at oral argument that he only makes a claim of persecution on account of political opinion, and not religion, in this appeal.

The Board concluded that Petitioner's immediate release after his abduction and interrogation by the revolutionary guard indicates that the event was merely an "isolated" "incident of violence" and that the regime's "interest in him was limited." *Id.* From this, and from the lack of any specific charges in the summons, the Board concluded that the summons was unrelated to the prior incidents. However, as the State Department *Country Reports* cited by the Petitioner aptly demonstrate, it was common in Iran to experience a brief detention and then have it followed by a more formal arrest by the Revolutionary Guard: [6]

> Political arrests are made by members of the Revolutionary Guard or, less commonly, by members of the komiteths, local neighborhood groups which have assumed a quasi-official role. No judicial determination of the legality of detention exists in Iranian law.... Suspects are held for questioning at local Revolutionary Guard offices or in jails [and] it is unclear whether this questioning constitutes a trial by a Revolutionary court or whether it is part of the investigation process. *Sometimes defendants are released after several hours or days, but the process may be repeated two or three times before the authorities decide the detainee is innocent or that he is guilty and should be jailed.*

Department of State, Country Reports on Human Rights Practices for 1987, at 1161 (1988) [hereinafter Country Reports] (emphasis added).

Undoubtedly, Petitioner's experience fits this pattern. Although Petitioner had been questioned on numerous prior occasions, he was seized and beaten only immediately following the dinner-party incident during which his wife and an officer's wife got into a fight concerning his wife's religion. His detention was occasioned by this incident, and it is clear that the incident at the dinner had resparked the authorities' interest in him. Thus, in light of the pattern described in the Country Reports, the receipt of a summons several weeks later can only be viewed as

related to this incident. While the Board emphasized Petitioner's testimony that the summons contained no charges, the Country Reports indicate that arbitrary detentions are the norm. Moreover, unlike the Board, we do not perceive the time-lag between the time of the abduction and beating and receipt of the summons to indicate that the two incidents were unrelated. As the Country Reports indicate, informal detentions often conclude with the victim's release, only to be followed again later by more formal incarcerations.

Once it is recognized that the summons fit into an overall pattern of political arrests and detentions on the part of the Iranian regime, we have little trouble concluding that the evidence compels the conclusion that a reasonable person in Petitioner's position would possess, upon receipt of the summons, a well-founded fear of persecution *on account of political opinion.*

While in the army, Petitioner was subjected to weekly interrogations. He testifies that the subject of these interrogations included the purpose of the time he spent in the United States, the fact that he was married to a Mormon, his wife's employment at the Argentine Embassy, and their fraternization with two Argentine United Nations soldiers. According to Petitioner, it was on the basis of this friendship with the Argentine soldiers that he was "suspected of ... being a spy; working against the regime."

Similarly, he was questioned by the Revolutionary Guard concerning possible espionage that might have been accomplished through his wife's employment with the Argentine Embassy. However, despite this similarity in substance, it is clear that the tenor of the interrogations after the dinner party incident was different than those Petitioner experienced earlier. Petitioner was abducted by the *Revolutionary Guard;* as the Country Reports indicate, this in itself provides a political overtone to the interrogations that was absent during those conducted by the army. It is also clear that there was a greater emphasis placed on Petitioner's

---

6. Moreover, there is no reason to believe that conditions have changed. *See* Department of State, Country Reports on Human Rights Prac- tices for 1990, at 1446 (1991) (describing the continuation of these practices).

connections with America. As Petitioner testified:

> [D]ifferent people start[ed] interrogating me, and I stay[ed] overnight and ... I was beaten and kicked and punched and [they called me "]you American.["] They looked at me as an American person coming from the United States[. They said] ["]you spy,["] you know.

This additional emphasis on Petitioner's American connections was also testified to by his wife. Although she did not believe that the regime abducted her husband because of her specific religious beliefs, she asserted that the fact she was a Mormon led the regime to view her husband as a political enemy:

> What [the Revolutionary Guard said was] that if I was a Mormon, okay, I could be a spy because the Mormon[s were] a CIA [front]—and it was just a name for a religion to be able to control people to enter [into] another country, just to control another spy.

We believe that the nature and circumstances of the post-dinner incident interrogations indicate that, as the Petitioner puts it, the regime had come to the conclusion that Petitioner did not hold "politically correct" views. First, as recounted above, the Revolutionary Guard placed a much greater emphasis on the Petitioner's connections with the West than had the prior army interrogations. While Petitioner's past connections with America and his wife's Mormon religion were discussed in prior interrogations, he was only accused of espionage *because of* their specific contacts with Argentine soldiers. The interrogations that took place after the abduction, however, demonstrate that Petitioner's and his wife's connections with the West branded them in the eyes of the Revolutionary Guard as suspected political enemies of the regime.

Second, while it is true that the regime indicated that they suspected that he and his wife were spies, the authorities knew of *all* the relevant information—their connections with the Argentines and past travels in the West—*years* before the dinner incident. Thus, assuming *arguendo* that the regime might have been within its rights to interrogate Petitioner for espionage, the *timing* of his abduction by the Revolutionary Guard indicates that the *motive* for the interrogations stemmed from the dinner incident and a suspicion of political disloyalty.

This conclusion is supported by Petitioner's testimony that, after the abduction incident, he tried to obtain a passport, but could not because he was "blacklisted," and shortly afterwards received the summons from the Revolutionary Guard. The receipt of the summons, in addition to bringing home to Petitioner on a subjective level that he was in danger,[7] indicates to us that the regime was not interested in him merely for suspected espionage. If Petitioner was still suspected of conveying his country's secrets to the West following his interrogation, there would have been little point in waiting for a month before taking action. However, as described in the Country Reports, political arrests are made on a much more haphazard basis and might involve repeated detentions over a period of time.

■ Thus, the cumulative effect of the incidents when considered in light of the general pattern by which political arrests are carried out in Iran, compels the conclusion that the regime's interest in Petitioner was political in nature. Whether or not Petitioner actually held the beliefs that the regime attributed to him, it is enough that the regime "falsely attributes an opinion to the victim, and then persecutes the victim because of that mistaken belief about the victim's views." *Canas–Segovia v. INS,* 970 F.2d 599, 602 (9th Cir.1992). Moreover, Pe-

---

7. The Board never questioned that Petitioner's fear was genuine, only that it could not be based objectively on fear of *political* or *religious* persecution. Thus, like the Board, we assume Petitioner's fear was genuine. In addition, the evidence clearly compels this conclusion. Petitioner testified that his flight from Iran upon receipt of the summons occurred shortly after he bought out his business partners. Moreover, Petitioner testified that receipt of the summons triggered a fear that the Revolutionary Guard was going to kill him for suspected political disloyalty. Given that Petitioner's experiences fit the pattern described in the Country Reports, we cannot conclude that his fear was anything but genuine.

titioner's receipt of the summons demonstrates that the regime is likely to persecute him on that basis in the future. Persecution is all the more probable because Petitioner fled Iran through Turkey without a passport. Consequently, we conclude that the evidence compels the conclusion that Petitioner has a well-founded fear that, if he is returned to Iran, he will be persecuted by the regime because it regards him as a political enemy; accordingly, the Board's decision must be reversed.

## IV. Conclusion

For the above reasons, the Petition is granted, and the decision of the BIA with respect to Petitioner's eligibility for asylum is reversed, and the case remanded to the Board to consider whether, in its discretion, *see INS v. Cardoza–Fonseca*, 480 U.S. 421, 428 n. 5, 107 S.Ct. 1207, 1211 n. 5, 94 L.Ed.2d 434 (1987), Petitioner and his wife should be granted asylum.

**Reversed and Remanded.**