69 F.3d 543
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Graciela CASTILLO-PONCE; Yudaisi Montes de Castillo, Petitioners,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 93-70065.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 10, 1994.
Withdrawn From Submission Aug. 24, 1994.
Resubmitted Sept. 7, 1995.
Decided Sept. 11, 1995.
 
 Before: FLETCHER, HALL, and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Graciela Castillo-Ponce and her daughter Yudaisi Montes de Castillo, natives and citizens of Cuba, petition for review of the Board of Immigration Appeals' ("BIA") dismissal of their appeal of the immigration judge's ("IJ") decision denying their applications for asylum and withholding of deportation pursuant to 8 U.S.C. Secs. 1158 & 1253(h). We grant the petition for review in part, affirming the decision of the BIA with regard to the withholding of deportation but reversing and remanding with regard to the petitioners' applications for asylum.
 
 FACTUAL BACKGROUND
 
 3
 Castillo-Ponce is a native and citizen of Cuba. Since 1974, she has been married to Jesus Montes de Oca. Prior to the marriage, Montes de Oca was imprisoned for his refusal to participate in the Comite de Defensa Revolutionario ("CDR"), a Cuban communist organization. He was neither sentenced nor charged with the commission of any crime, but instead was arrested for "peligrosidad," or "dangerousness." According to a report prepared by the State Department, the classification of "dangerous" is conferred on those "deemed to have a proclivity for conduct contrary to Socialist Principles." (AR 177: Department of State, Country Reports on Human Rights Practices for 1987 (hereinafter "State Department Report "), at 445.)
 
 
 4
 After Montes de Oca was released from prison, he was able to find only menial work because of his refusal to join the government. He left Cuba in 1980 as part of the Mariel boatlift and in 1987 became a lawful permanent resident of the United States.
 
 
 5
 The petitioners were not permitted to leave Cuba with Montes de Oca. About a year and a half after Montes de Oca left Cuba, Castillo-Ponce applied for an exit visa to leave Cuba. Because of this application to emigrate, Castillo-Ponce was also labeled "dangerous." When Castillo-Ponce's employer learned that she had requested permission to emigrate from Cuba, it fired her, informing her that she had no right to employment because she had requested to leave Cuba.
 
 
 6
 When Castillo-Ponce attempted to support herself and her daughter by selling food and merchandise on the streets, the CDR members in her neighborhood informed the government, which threatened to imprison her if she did not stop. Castillo-Ponce then obtained a job as a secretary in a hospital in Havana. She was discharged six months later, however, when her employer learned of her application to leave Cuba.
 
 
 7
 In 1984, the petitioners received visas to leave Cuba. They went to Panama, stayed there for approximately two weeks, and then entered the United States without inspection. They were soon apprehended and deportation proceedings commenced. At their first appearance with counsel in deportation proceedings, the petitioners conceded deportability but requested asylum and withholding of deportation.
 
 
 8
 On May 31, 1988, petitioners appeared with counsel for their asylum hearing. Castillo-Ponce testified that, if returned to Cuba, she and her daughter would be persecuted due to their political and religious beliefs. The IJ found Castillo-Ponce's testimony regarding her husband to be vague and the testimony regarding her employment in Cuba to be not credible. The IJ also found that Castillo-Ponce's religious beliefs would subject her to discrimination, not persecution, and declined to grant asylum or withholding of deportation.
 
 
 9
 On appeal, the BIA reviewed the record de novo and concluded that although Castillo-Ponce's testimony was somewhat vague, it did not support an adverse credibility finding. The BIA concluded that Castillo-Ponce and Montes de Castillo failed to satisfy the standards for eligibility for asylum or withholding of deportation because the petitioners' "refusal to participate in the communist process is not enough to prove persecution." The BIA noted that Castillo-Ponce found a job as a secretary in 1983, and concluded that the gaps in her employment were shorter than her testimony indicated. It determined that her claim of religious persecution was not supported by the record.
 
 DISCUSSION
 
 10
 Petitioners seek asylum and withholding of deportation pursuant to 8 U.S.C. Secs. 1158(a) & 1253(h), respectively.
 
 I. Application for asylum
 
 11
 The relief of asylum is discretionary. The Attorney General may grant asylum to an alien who establishes that she is a "refugee." A "refugee" is one who is unable or unwilling to return to her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. Sec. 1101(a)(42)(A).
 
 
 12
 The "well-founded fear of persecution" standard has both a subjective and an objective component. "The subjective component may be satisfied by 'an applicant's credible testimony that he genuinely fears persecution.' " Shirazi-Parsa v. INS, 14 F.3d 1424, 1427 (9th Cir.1994) (quoting Acewicz v. INS, 984 F.2d 1056, 1061 (9th Cir.1993)). "The objective inquiry requires 'a showing by credible, direct, and specific evidence of facts supporting a reasonable fear of persecution on the relevant ground.' " Prasad v. INS, 47 F.3d 336, 338 (9th Cir.1995) (quoting Shirazi-Parsa, 14 F.3d at 1427). An alien need not show that it is more likely than not that she will be persecuted in order to be classified as a refugee. INS v. Cardoza-Fonseca, 480 U.S. 421, 431 (1987).
 
 
 13
 We uphold the BIA's determination regarding a petitioner's eligibility for asylum if it is supported by substantial evidence. See generally INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). "Under this standard, a court must review 'the findings by a slightly stricter scrutiny than the clear error standard.' " Shirazi-Parsa, 14 F.3d at 1427 (quoting Rodriguez-Rivera v. INS, 848 F.2d 998, 1002 (9th Cir.1988) (per curiam)). Applying this standard of review, we conclude that the record lacks substantial evidence to support the BIA's finding that Castillo-Ponce does not have a well-founded fear of persecution.
 
 
 14
 The BIA recognized that both Castillo-Ponce and her husband refused to join the CDR, but concluded that "the refusal to participate in the communist process is not enough to prove persecution" and that, in any event, Castillo-Ponce could find employment. This conclusion fails to consider evidence of the uniquely oppressive conditions in Cuba for individuals who do not agree with the communist party and the effect of the petitioners' application for emigration on their lives in Cuba. The BIA also failed to consider the implications of the petitioners' actual emigration to the United States and application for asylum here.
 
 
 15
 Although non-participation in the political process alone generally is insufficient to prove a well-founded fear of persecution, the record contains substantial evidence that Cubans who do not participate in the communist party suffer from persecution. Although it was included in the record, the BIA failed to consider information in the State Department Report on Cuba, which indicates that all individuals are expected to act in conformity with the communist party. (AR 173: State Department Report at 441); see Shirazi-Parsa, 14 F.3d at 1428 (noting that State Department reports provide vital context in which the petitioner's claim of persecution must be evaluated). The report also notes that "[u]nder the [Cuban] Constitution, no legal protection can be invoked to prevent the State from arresting anyone it considers harmful to the 'decision of the Cuban people to build socialism and communism.' " (AR 177: State Department Report at 445.)
 
 
 16
 Membership in the CDR is "virtually mandatory" in Cuba, and CDRs "exist on virtually every block in Cuban municipalities." "Daily life is closely monitored by the [CDR], ... [and] CDR members are expected to report anything 'unusual.' " (AR 180: State Department Report at 448.) Thus, although political neutrality generally does not constitute a political opinion, the State Department Report suggests that Castillo-Ponce's refusal to participate in the communist party is perceived in Cuba as overt and hostile political action.
 
 
 17
 The BIA's decision also fails to consider fully the implications of Castillo-Ponce's application to emigrate in 1981. According to the State Department,
 
 
 18
 those who have applied to emigrate are routinely denied ration cards, identification documents and employment. Often denied the means of earning a living, they must rely on the generosity of family and friends or try to find work illegally outside the official economy.
 
 
 19
 Id. Moreover, "their children may be refused further schooling." Id. at 450. Castillo-Ponce's application for an exit visa to leave Cuba resulted in her being labeled as "dangerous." According to the State Department Report, "[p]ersons receiving this designation are subject to repeated arbitrary arrest and indefinite detention, often punctuated by brutal interrogation." (AR 177: State Department Report at 445.)
 
 
 20
 The record contains Castillo-Ponce's uncontroverted testimony, which the BIA deemed to be credible, that her refusal to join the CDR and her application to emigrate destroyed her ability to enjoy gainful employment in Cuba. The "deliberate imposition of substantial economic disadvantage upon an alien for reasons of race, religion, or political opinion" constitutes persecution. See Kovak v. INS, 407 F.2d 102, 107 (9th Cir.1969); see also United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees, p 54 at 15 (noting that discrimination amounts to persecution "if measures of discrimination lead to consequences of a substantially prejudicial nature" such as "serious restrictions on [a person's] right to earn his livelihood").[1]
 
 
 21
 As a result of her application to emigrate, Castillo-Ponce's employer fired her. When she tried to support herself and her daughter by working as a street vendor, she was reported to the government by the CDR and threatened with imprisonment unless she ceased her efforts to find work outside of the official economy. Castillo-Ponce's inability to work even outside of the official economy because of her refusal to join the CDR and her application for an exit visa constitutes "something more than generalized economic disadvantage" in Cuba. Cf. Raass v. INS, 692 F.2d 596, 598 (9th Cir.1982).
 
 
 22
 The BIA recognized that Castillo-Ponce was fired from work because of her application to emigrate, but concluded that she failed to prove a well-founded fear of persecution because she eventually obtained a secretarial position in 1983. However, Castillo-Ponce was fired from that job as well when her employer learned that she had applied to emigrate from Cuba. Thus, nothing in the record supports the BIA's conclusion that Castillo-Ponce was able to find employment and to support herself and her family after she applied to emigrate.
 
 
 23
 The BIA also failed to consider the effect of Castillo-Ponce's actions since she left Cuba on her exit visa and emigrated to the United States and applied for asylum here. In Cuba, seeking asylum is a crime. According to the State Department Report, Cubans who requested asylum from foreign embassies in Havana have been imprisoned or denied employment, and their children denied an education. (AR 178: State Department Report at 445.)
 
 
 24
 Finally, although the BIA concluded that the petitioners do not have a well-founded fear of persecution based on their religious beliefs, it failed to consider the petitioners' fear of persecution for their religious beliefs in combination with their political beliefs. A well-founded fear of persecution can be based on a combination of factors. E.g., Blanco-Comarribas v. INS, 830 F.2d 1039 (9th Cir.1987) (petitioner established a well-founded fear of persecution based on his religion and his family's political activities). Since coming to the United States, Castillo-Ponce has become active in the Catholic church. She notes that she is deeply religious, goes to mass daily, is in a rosary group, and actively works to convert others to her religion. According to the State Department Report, "Despite outward signs of greater official religious tolerance, Cubans who practice their religion face serious discrimination and, occasionally, legal penalties." (AR 181: State Department Report at 449.) It also indicates that Catholicism is strongly discouraged in Cuba. The fact that Castillo-Ponce is both a Catholic and someone who has chosen to emigrate from Cuba strengthens her overall claim for asylum.
 
 
 25
 In sum, the record does not support the BIA's finding that Castillo-Ponce failed to prove a well-founded fear of persecution on return to Cuba.[2] Castillo-Ponce testified as to her subjective fears on returning to Cuba, and the BIA concluded that her testimony was credible. Objective evidence supports her claim that her fear of persecution on return to Cuba is well-founded. Included in this evidence is her and her husband's refusal to join the CDR, evidence detailing the oppressive conditions in Cuba for individuals who do not participate in the communist party, her application to emigrate and subsequent emigration, and her inability to earn a livelihood due to these political actions.
 
 II. Claim for withholding of deportation
 
 26
 An alien who seeks withholding of deportation must show that she faces a "clear probability of persecution" if deported. INS v. Stevic, 467 U.S. 407, 414 (1984). Under the "clear probability" standard, the alien must prove that it is "more likely than not" that she would be subject to persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. Id. at 429-30. Upon establishing eligibility, the alien's entitlement to withholding of deportation is mandatory. 8 U.S.C.A. Sec. 1253(h)(1) (West Supp.1994).
 
 
 27
 Although we reverse the BIA's finding that the petitioners lack a well-founded fear of persecution, we affirm the BIA's conclusion that petitioners failed to demonstrate that it is more likely than not that they will suffer from persecution if they are deported to Cuba. The "clear probability" standard for withholding of deportation requires a stronger evidentiary showing than the "well-founded fear" standard for asylum. Cardoza-Fonseca, 480 U.S. at 431. The petitioners have introduced substantial evidence demonstrating that they have a well-founded fear of persecution, but they have not presented specific evidence regarding the frequency with which individuals who are labelled "dangerous" are subject to persecution. Absent such evidence, we cannot conclude that it is more likely than not that the petitioners will face persecution if returned to Cuba.
 
 CONCLUSION
 
 28
 We deny the petition for review of the BIA's decision that the petitioners failed to establish that it was more likely than not that they would be persecuted if deported to Cuba; therefore, the petitioners are not entitled to mandatory withholding of deportation under 8 U.S.C. Sec. 1253(h)(1). We grant the petition for review of the denial of asylum and reverse the BIA's decision in that regard. The petitioners have established a well-founded fear of persecution and are "refugees." We remand to the BIA to exercise its discretion with respect to the petitioners' asylum application.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 American courts consistently look for guidance to the U.N. Handbook when seeking to interpret the term "refugee." Cardoza-Fonseca, 480 U.S. at 438-39 & n. 22
 
 
 [2]
 Although the INS argues that the evidence in the record relates only to Castillo-Ponce and not to her daughter, Montes de Castillo, both the IJ and the BIA treated Montes de Castillo's application for asylum as derivative of her mother's, see 8 C.F.R. Sec. 208.21; Shirazi-Parsa, 14 F.3d at 1425 n. 1, and the INS did not object