**Rina Kumari SURITA, a.k.a. Rina Kumari; Afzal Yunas, Petitioners,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 95–70210.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 14, 1996.

Decided Sept. 9, 1996.

Suzanne B. Friedman and Thomas L. Hiester, Daly City, CA, for petitioners.

Lisa M. Arnold (argued), and Christine Bither (on the briefs), Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for respondent.

Before: PREGERSON and TROTT, Circuit Judges, and WINMILL,* District Judge.

PREGERSON, Circuit Judge:

Petitioners Rina Kumari Surita ("Surita") and her minor son, Afzal Yunas ("Yunas"), ethnic Indian citizens of Fiji, petition for review of a decision of the Board of Immigration Appeals ("BIA" or "Board"). The BIA affirmed an immigration judge's denial of Surita's and Yunas's application for asylum and withholding of deportation, finding them statutorily ineligible for such relief from deportation under Sections 208(a) and 243(h) of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158(a), 1253(h). We have jurisdiction under 8 U.S.C. § 1105a(a), and we grant the petition and remand to the BIA for further proceedings.

## I. BACKGROUND

Surita is a forty-one-year-old native and citizen of Fiji. Ethnically, she is of Indian descent and her religion is Hindu. Surita entered the United States on or about July 1, 1987 on a visitor's visa with her two-year-old son, Yunas, and her parents.[1] On March 30, 1990, the INS issued an Order to Show Cause why Surita and Yunas should not be deported for overstaying their visas. Surita and Yunas conceded deportability but applied for asylum and withholding of deportation.[2]

Surita submitted newspaper articles and the U.S. Department of State's *Country Reports on Human Rights Practices for 1990,* [hereafter *Country Report* ] in support of her asylum application. According to the *Country Report,* Fiji's population is about evenly divided between indigenous Fijians ("ethnic Fijians") and Fijians of Indian descent ("Indo–Fijians"). Department of State, *Country Reports on Human Rights Practices for 1990,* S. Prt. No. 5, 102d Cong., 1st Sess. 882, 882 (1991). In May 1987, the ethnic Fijian dominated military "overthrew the [Indo–Fijian] dominated government of Prime Minister Timoci Bavadra, elected one month earlier." Stan Ritova, *Fiji President Promulgates Constitution, Elections Next Year,* Reuter Library Report, July 25, 1990. The overthrown government, a parliamentary democracy, had been the first such government dominated by Indo–Fijians. Kevin Brown, *Fijians Consolidate Political Power,* Financial Times (London), July 26, 1990, at 4. The coup also abrogated the 1970 constitution. *New Constitution Proclaimed in Fiji,* Windsor Star, July 25, 1990 (final edition).

---

* Honorable B. Lynn Winmill, United States District Judge for the District of Idaho, sitting by designation.

1. Surita's parents are now U.S. lawful permanent residents.

2. As a minor child, Yunas was included on his mother's asylum application. He will qualify for asylum derivatively if Surita qualifies for asylum. 8 C.F.R. § 208.21(a). Their application for asylum is also deemed to be an application for withholding of deportation. 8 C.F.R. § 208.3(b).

The stated purpose of the coup was to "ensure the political supremacy of the indigenous Fijian people." *Country Report* at 887. Although the military eventually stepped down and turned power over to a civilian government, the coup leader, Major–General Rabuka, and the ethnic Fijian dominated military remained influential. *Id.*

In 1990, a new constitution was promulgated that "aims to guarantee political primacy for ethnic Fijians by reserving for them a disproportionate number of seats in the lower house of Parliament." *Country Report* at 882. The new constitution also guarantees an ethnic Fijian majority in the Senate and contains procedures designed to ensure an ethnic Fijian president and prime minister. The new constitution was "promulgated by an unelected interim government and was never approved by a national referendum." *Id.* at 886. The new constitution also guarantees to Major–General Rabuka, the coup leader, immunity from prosecution. Brown, *supra*, at 4.

Continued discrimination by ethnic Fijians against Indo–Fijians remains one of "[t]he principal human rights concerns" for Fiji. *Country Report* at 882. "Indians are subject to significant harassment and crime based on race, compounded by inadequate police protection. In 1989 five Indian temples and a mosque were subject to acts of arson or other desecration by a group of Fijian youths." *Id.* at 888. Although the *Country Report* indicates that, in this instance, the alleged perpetrators were brought to trial, only one received a prison sentence and the others received suspended sentences. *See id.* at 888. It is thus unclear, for those who are prosecuted for crimes against Indo–Fijians in high-profile cases, whether punishments are genuine or merely slaps on the wrists. *See also id.* at 883. Moreover, the *Country Report* also states that the perpetrators of crimes against Indo–Fijians "escape more often than not." *Id.*

The *Country Report* also states that, "[f]reedom of religion is provided for in the [new] Constitution and honored in practice. The constitution declares the importance of Christianity to the Fijian people but guarantees protection for all religions." *Id.* at 885.

As the facts are not in dispute, we accept as true Surita's testimony at her deportation hearing. *Singh v. Ilchert,* 69 F.3d 375, 378 (9th Cir.1995). Surita worked for more than ten years as an administrator and nurse for projects in Fiji funded by the U.S. Agency for International Development. She drove across a single lane bridge on the way to and from work every day and had to stop and wait for cars coming from the other direction before she could cross. On May 15, 1987, the day after the first coup, armed ethnic Fijians, some in military uniform, surrounded her car and demanded money while she was stopped at the bridge. Every time Surita subsequently crossed the bridge going to or coming from work, ethnic Fijians robbed her again. After the first robbery, Surita made sure she always carried money with her. She believes that the men would have beaten, arrested, or raped her if she had refused to give them money.

On one occasion, the men at the bridge pulled a woman and her daughter out of the car in front of Surita and forced them to sit on the street. Surita did not see what ultimately happened to the women; she gave the men the money they demanded and then drove away. Surita stopped going to work about one week after the coup because she was afraid of what the soldiers might do to her at the bridge. She was afraid that, even though she gave the soldiers money, they might beat or rape her.

Surita testified that she was subjected to these robberies because she is Indo–Fijian. She reported the robberies to the police but the police said they could not do anything and did not explain why.

On the evening of May 25, 1987, Surita and her son were at her parents' home, where she regularly stayed. Twelve ethnic Fijian soldiers armed with guns and knives broke down the door and entered the house. They pointed their weapons at Surita and her family and ordered them to sit on the sofa. They threatened to hurt the family with their weapons if they moved or said anything. The soldiers looted the house, taking all the family's belongings, including their shoes and clothing. The soldiers remained in the house

for about an hour. The soldiers told Surita that the family's possessions belonged to ethnic Fijians, and that they should "go back home" to India because Fiji was for ethnic Fijians. The soldiers also threatened to rape and kill Surita if she reported the robbery to the police.

Despite these threats, Surita reported the robbery to the police the following day. The police officers with whom she spoke were ethnic Fijians. These officers said that they "cannot do anything right now," but that they would "see later on." The police never contacted Surita nor went to the family's home to investigate the robbery.

Indo–Fijian neighbors told Surita that soldiers had also broken into their homes and robbed them. Between the date of the robbery and the date Surita and her family left Fiji, the soldiers returned to Surita's family's home at least once. The soldiers looked around but apparently did not again enter the house.

In addition, the Hindu temple that Surita attended was desecrated one or two days after the coup. Ethnic Fijians damaged all the religious statues, tore up the religious books, and closed the temple. When Surita and her mother attempted to go to another temple, ethnic Fijians stopped them and stole Surita's mother's jewelry.

Surita left Fiji six or seven weeks after the May coup because she was frightened. Remaining in Fiji had become dangerous for Indo–Fijians. She could not go out of her house, could not go to work, and could not go to temple. The police would not protect her because she was Indo–Fijian. When she left, ethnic Fijian soldiers working security at the airport confiscated her school certificates and other documents. The soldiers did not tell her why they confiscated these documents.

Of Surita's eight brothers and sisters, five now live in the United States and are either U.S. citizens or lawful permanent residents, and two now live in Australia; only one brother remains in Fiji. This brother and other relatives wrote Surita that the Hindu temple she attended remained closed. These relatives also wrote Surita that Indo–Fijians were not allowed to practice their Hindu

religion, go to any temple, or meet in a group. Surita has heard that ethnic Fijians now occupy her parent's house. She believes that her life would be in danger if she were to return to Fiji because Indo–Fijians continue to be harassed and beaten.

On August 20, 1991, the immigration judge ("IJ") denied Surita's application for asylum and withholding of deportation but granted her voluntary departure. The IJ found credible and consistent Surita's testimony regarding the treatment she received from ethnic Fijians before she left Fiji and her fear of returning there. The IJ also found that Surita's testimony "concerning the situation in Fiji, especially following the coup," was substantiated by the *Country Report*. The IJ stated that, "[t]here is no question that [Surita] has been harassed. There is no question that she has been discriminated against by the native Fijians. There is no question that she has been frightened by them." The IJ concluded, however, that Surita had failed to demonstrate either that she had suffered past persecution or that she possessed a well-founded fear of future persecution.

Surita appealed to the BIA, alleging past persecution and a well-founded fear of future persecution on account of her Hindu religion and Indo–Fijian ethnicity. She also alleged that she had demonstrated a clear probability of persecution, thus entitling her to withholding of deportation. On February 3, 1995, the BIA affirmed the IJ's denial of asylum and withholding of deportation.

## II. DISCUSSION

### A. Applicable Law

To qualify for asylum, an applicant must show that she is a refugee. INA § 208(a), 8 U.S.C. § 1158(a). A refugee is defined as someone who is unable or unwilling to return to her home country because "of past persecution, or . . . a well-founded fear of future persecution, on account of race, religion, nationality, membership in a particular social group, or political opinion." *Prasad v. INS,* 83 F.3d 315, 318 (9th Cir.1996) (hereafter *"Gaya Prasad"*). If an asylum applicant qualifies as a refugee and is thus

statutorily eligible for asylum, a grant of asylum remains within the discretion of the Attorney General. INA § 208(a), 8 U.S.C. § 1158(a).

▮ Persecution is "a seemingly broader concept than threats to life or freedom." *INS v. Stevic*, 467 U.S. 407, 428 n. 22, 104 S.Ct. 2489, 2500 n. 22, 81 L.Ed.2d 321 (1983) (internal citations omitted). We have defined persecution as "the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive." *Prasad v. INS*, 47 F.3d 336, 339 (9th Cir.1995) (hereafter *"Kamla Prasad"*) (citations omitted). Moreover, while a single incident, in some instances, may not rise to the level of persecution, the cumulative effect of several incidents may constitute persecution. *Shirazi–Parsa v. INS*, 14 F.3d 1424, 1428 (9th Cir.1994), *overruled on other grounds by Fisher v. INS*, 79 F.3d 955, 963 (9th Cir.1996) (en banc). Persecution by a group that the government of the proposed country of deportation is unwilling or unable to control also constitutes persecution. *McMullen v. INS*, 658 F.2d 1312, 1315 n. 2 (9th Cir.1981).

### B. Standard of Review

▮ Where, as here, the BIA conducts its own review of the record, makes its own findings, and independently determines the sufficiency of the evidence, this court reviews the BIA's determinations rather than those of the IJ. *See Castillo v. INS*, 951 F.2d 1117, 1120–21 (9th Cir.1991). The BIA's discretionary denial of asylum is reviewed for an abuse of discretion. *Ramos–Vasquez v. INS*, 57 F.3d 857, 861 (9th Cir.1995). Factual findings underlying the denial, however, including whether the applicant has proved a well-founded fear of persecution, are reviewed for substantial evidence. *Ghaly v. INS*, 58 F.3d 1425, 1429 (9th Cir.1995). Here, the Board never reached the issue of whether Surita merited a discretionary grant of asylum because it determined that she was statutorily ineligible for asylum and for withholding of deportation. We therefore review for substantial evidence.

▮ We will uphold the BIA's factual determination of asylum eligibility "if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Kamla Prasad*, 47 F.3d at 338 (quoting *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992)). To reverse the BIA's refusal to grant asylum, an applicant "must demonstrate that the 'evidence [she] presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution.'" *Fisher*, 79 F.3d at 961 (quoting *Elias–Zacarias*, 502 U.S. at 483–84, 112 S.Ct. at 817).

### C. Analysis

#### 1. Asylum

▮ The BIA erred in finding that Surita had not suffered past persecution on account of race. She was robbed by ethnic Fijians on her way to and from work every day for about one week; she was thus robbed a total of ten to fifteen times. She was subjected to these robberies because she is Indo–Fijian. Surita reported the robberies to the police, but the police said they could not do anything and did not explain why they could or would not protect her nor arrest the men. Fearing bodily harm, Surita was compelled to quit her job of more than ten years and was afraid to leave her home.

In addition to these street robberies, ethnic Fijian soldiers broke down the door of Surita's parent's home, held the family at gunpoint, and looted the house. The soldiers stated that they were looting the family's home because the family was of Indian descent and that Surita and her family should "go back home" to India. The soldiers threatened to harm Surita, her son, and her parents. The soldiers specifically threatened to rape and kill Surita if she reported the robbery to the police. When Surita reported this robbery and asked for protection, the police told her that "we cannot do anything right now" and never conducted an investigation. Again, the police never explained why they could or would not protect Surita and her family or arrest the men.

The BIA should have concluded that these multiple robberies and threats constitute past persecution on account of race. Ethnic

Fijians inflicted suffering and harm on Surita because she differed from them racially and they regarded this racial difference as offensive. Moreover, the police were apparently unwilling or unable to control Surita's persecutors. Any reasonable finder of fact would be compelled to conclude that Surita in fact suffered persecution on account of race.

This court recently decided two other Indo–Fijian asylum cases, *Gaya Prasad* and *Kamla Prasad*. In *Gaya Prasad*, we reversed the BIA's denial of asylum. *Gaya Prasad*, 83 F.3d at 318. In *Kamla Prasad*, we affirmed the BIA's denial of asylum, stating that, "[a]lthough a reasonable factfinder *could* have found" that the applicants had been persecuted, "a factfinder would [not] be compelled to do so." *Kamla Prasad*, 47 F.3d at 340.

In *Gaya Prasad*, we concluded that the applicant was entitled to asylum because he had been persecuted by ethnic Fijian soldiers. *Gaya Prasad*, 83 F.3d at 317. These soldiers detained Gaya Prasad on three occasions, beat him, and "subjected [him] to sadistic and degrading treatment." *Id.* at 318. The soldiers persecuted Gaya Prasad because of his advocacy for Indo–Fijian worker's rights and his support for the Indo–Fijian led Labour party. Gaya Prasad was also warned by the soldiers not to practice his Hindu religion in a public place. He was forced to resign from his job. *Id.* at 317. We concluded that any reasonable finder of fact would be compelled to find that Gaya Prasad had suffered past persecution. *Id.* at 318.

Surita's experiences in Fiji after the coup were similar to Gaya Prasad's. Both were targeted for persecution by ethnic Fijians on several occasions. Both were forced to resign from their jobs. Both were persecuted on account of statutorily protected factors-Surita on account of her race, and Gaya Prasad on account of his political opinion, religion, and, by implication, his race. Like the soldiers' persecution of Surita, the soldiers' persecution of Gaya Prasad "occurred in a climate of official prejudice against ethnic Indians in general, but [the persecution was] directed against Prasad in particular." *Gaya Prasad*, 83 F.3d at 318.

As compared to the similarities between the persecution suffered by Surita and that suffered by Gaya Prasad, Surita's experiences in Fiji were less similar to the applicant's experiences in *Kamla Prasad*, 47 F.3d at 339–40. Kamla Prasad, an Indo–Fijian taxi driver, was stopped at a roadblock by ethnic Fijians. These men detained him for a few hours. Although the men questioned Kamla Prasad about his support for the Labour Party and he was "hit on his stomach and kicked from behind," the men did not threaten him with any future harm. *Id.* at 339. The majority opinion emphasized that Kamla Prasad was released after a few hours, did not require medical treatment, was not charged with any crime, and that there was no evidence that the Fijian government had any "continuing interest" in him. *Id.* The opinion also noted that many of Prasad's relatives "still reside in Fiji, apparently without incident." *Id.* The majority thus concluded that a reasonable finder of fact could have concluded that the treatment of Kamla Prasad was not sufficiently serious to constitute persecution. *Id.* at 340.

The only other incidents of harassment that Kamla Prasad testified to were that ethnic Fijians threw rocks at his house and attempted to steal property. *Kamla Prasad*, 47 F.3d at 340. Regarding these incidents, the opinion noted that there was no evidence that Kamla Prasad and his family were being singled out on account of their race, religion, or political opinion. *Id.* Kamla Prasad's wife also testified that she was harassed by Fijian soldiers but described only one incident in which soldiers boarded the bus she was riding in. Even then, the soldiers did not speak to her directly and did not detain her. *Id.*

Kamla Prasad presented far less evidence of persecution than did Surita and "specific factual indicators of persecution absent in that case are present here." *Gaya Prasad*, 83 F.3d at 318. Kamla Prasad was individually targeted by ethnic Fijians on only one occasion. In contrast, not only did ethnic Fijians rob Surita several times while driving to and from work, but they robbed her family in their own home. The ethnic Fijians never told Kamla Prasad why they detained him; the soldiers specifically told Surita that she

was being robbed because of her ethnicity. Kamla Prasad was not forced to quit his job; Surita was. Kamla Prasad was not threatened with future harm; Surita's family was threatened with harm, and Surita was specifically threatened with rape and murder. Furthermore, the soldiers returned to Surita's family's house before she fled Fiji. Ethnic Fijians reportedly now occupy the house. Many of Kamla Prasad's relatives remain in Fiji; all but one of Surita's close relatives have left Fiji.

Taken in the aggregate, these incidents and threats compel us to conclude that Surita suffered persecution, just as did Gaya Prasad. Unlike *Kamla Prasad*, no reasonable finder of fact could conclude otherwise.

■ A finding of past persecution triggers a regulatory presumption that the applicant has a well-founded fear of future persecution, which provisionally establishes the applicant's refugee status and eligibility for asylum. 8 C.F.R. § 208.13(b)(1)(i). To rebut this presumption, the INS must show, "by a preponderance of the evidence, that 'since the time the persecution occurred conditions in the applicant's country ... have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if ... [she] were to return.'" *Singh*, 69 F.3d at 378 (quoting 8 C.F.R. § 208.13(b)(1)(i)); *see also In re H–*, Int. Dec. 3276, 1996 WL 291910, at *8–11 (BIA May 30, 1996) (recognizing that 8 C.F.R. § 208.13(b)(1)(i) establishes a presumption of future persecution when an asylum applicant has demonstrated past persecution; *Matter of Chen*, 20 I. & N. Dec. 16 (BIA 1989)).

■ Some forms of past persecution also trigger a presumption that the applicant is entitled to withholding of deportation. If an applicant's "life or freedom was threatened in the proposed country of deportation, ... it shall be presumed that [her] life or freedom would be threatened on return to that country." 8 C.F.R. § 208.16. This presumption is rebutted only if "a preponderance of the evidence establishes that conditions in the country have changed to such an extent that it is no longer more likely than not that the applicant would be so persecuted there." *Id.*

The BIA in this case found that Surita had not shown past persecution. It therefore failed to reach the question whether the INS had demonstrated sufficient evidence to rebut either of these two presumptions. Given the record before us and because the BIA never applied the regulatory presumptions, we think it appropriate to remand this case. On remand, the BIA should allow the parties to supplement the record with evidence of current conditions in Fiji, and determine whether the INS can rebut, *by a preponderance of the evidence*, the regulatory presumptions regarding eligibility for asylum and entitlement to withholding of deportation.

### III. CONCLUSION

We conclude that Surita suffered past persecution on account of race, thus triggering regulatory presumptions that she is eligible for asylum and withholding of deportation. We remand to the BIA to resolve whether the INS can produce sufficient evidence to rebut these presumptions and for such further proceedings as are necessary to determine Surita's immigration status.

Petition GRANTED. REMANDED to the BIA for further proceedings.