Abdul GAFOOR; Bibi Nurun Nisha; Faymeeza Nisha; Farzana Nisha; Petitioners,

v.

**IMMIGRATION AND NATURALIZATION SERVICE,** Respondent.

No. 98–71201.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 9, 1999.

Filed Nov. 3, 2000.

Jorge Rodriguez–Choi (argued) and Suzanne B. Friedman, San Francisco, California, for the petitioners.

Alice E. Loughran, Office of Immigration Litigation, U.S. Department of Justice, Washington, D.C., for the respondent.

Before: O'SCANNLAIN, HAWKINS, and THOMAS,[1] Circuit Judges.

Opinion by Judge HAWKINS; Dissent by Judge O'SCANNLAIN.

MICHAEL DALY HAWKINS, Circuit Judge:

This is the latest in a long line of immigration cases involving claims of racial and political persecution against people of Indian descent living on the South Pacific island of Fiji. Like those asylum-seekers before him, Abdul Gafoor claims he was persecuted by ethnic Fijians on account of his Indian background and that he and his family will be harmed if forced to return to Fiji. We have taken the claims of Indo–Fijians very seriously because of the severe mistreatment they have suffered in their adopted country. Recent years have brought about improvements in Fiji, and consequently we have held in one case that changed country conditions rebutted the fears of an Indo–Fijian woman that she would be persecuted if sent home. *See Kumar v. INS,* 203 F.3d 831 (9th Cir. 2000). But the underlying racial tension between ethnic and Indo–Fijians has persisted, and in the past several months con-

1. Judge Thomas has been drawn to replace the late Circuit Judge Charles E. Wiggins. He has read the briefs, reviewed the record, and listened to the tape of oral argument held on December 9, 1999.

648

ditions in the country have deteriorated to their lowest point in 13 years.

It is in the context of these developments that we review the BIA's decision that Gafoor is not eligible for asylum and that he and his family must return to Fiji.[2] We conclude that the BIA's decision is not supported by substantial evidence, and we remand the case for a determination of whether recent events support Gafoor's fear that he will be persecuted if forced to return to Fiji.

## I. FACTS AND PROCEDURAL BACKGROUND

In 1874, when the British Empire assumed control of Fiji, the country was populated primarily by indigenous Fijians. Beginning in 1879, however, indentured workers from India were brought to Fiji to farm the expanding sugar plantations. When the importation of indentured workers stopped in the 1920s, a new wave of migrant workers began arriving from India, and by the mid–1960s Indo–Fijians accounted for more than half of the country's population.

Fiji gained independence from Britain in 1970 and instituted a system of parliamentary democracy under the leadership of Prime Minister Ratu Sir Kamisese Mara, an ethnic Fijian. Due to the emigration of Indo–Fijians and an increase in ethnic-Fijian birth rates, the population shifted again so that Indo–Fijians were slightly outnumbered by ethnic Fijians. Despite their similar size, however, the two groups remained rigidly separate. Indo–Fijians, overwhelmingly Hindu or Muslim, dominated the economy and professions, while ethnic Fijians, almost exclusively Christian, controlled the nation's military and its political structures. Racial intermarriage was virtually non-existent.

In 1987, after two decades of rule by ethnic-Fijians, the voters of Fiji elected the first government dominated by Indo–Fijians. The administration was short-lived, however; in May and October, the Fijian military staged two coups that ousted the Indo–Fijian government. According to the U.S. State Department, the "stated purpose of the 1987 military coups was to ensure the political supremacy of the indigenous Fijian people and to protect their traditional way of life and communal control of land." U.S. Dep't of State, *Country Reports on Human Rights Practices for 1992*, at 566 (1993). To achieve that purpose, the military installed an interim government led by Former Prime Minister Sir Kamisese. This "unelected, interim government" then promulgated a new constitution, which "was never approved by a national referendum" and which "ensur[ed] political dominance by ethnic Fijians." *Id.* at 565. The constitution effectively wrote Indo–Fijians out of the government, reserving a majority of seats in Parliament for ethnic Fijians, requiring the election of an ethnic Fijian Prime Minister, and ensuring the selection of an ethnic Fijian President. *See id.*

In addition to this structural discrimination, the coups resulted in widespread abuse and violence against Indo–Fijians. *See* U.S. Dep't of State, *Country Reports on Human Rights Practices for 1987*, at 694–700 (1988) [hereinafter *"Country Reports for 1987"*]. The Department of State received "numerous reports of physical abuse of detainees by the military," some of whom "were forced to run barefoot on blacktop roads in the hot sun for several kilometers or were dumped in pit latrines or in the sewage treatment holding plants." *Id.* at 695. "The most horrible reported attacks on Indo–Fijians include women raped in front of their children, political opponents brutally beaten, detainees forced to walk naked in the streets while holding human excrement, people forced to swim in sewage ponds,

2. Gafoor is the primary applicant for asylum; the claims of his wife and two children are derivative of his application.

and children stripped and beaten for Sunday curfew violations and forced to rub their noses against a concrete floor until their noses bled." *Singh v. INS*, 94 F.3d 1353, 1357 (9th Cir.1996). "Ethnic Fijian youth gangs . . . raided, stoned, and fire bombed Indo–Fijian homes. In 1989, five Hindu temples were burned. In October 1990, an Indian school was burned." *Id.* "Freedom of speech [was] severely constrained," and "[p]olitical meetings and demonstrations [were] banned." *See Country Reports for 1987*, at 696–97. Fearing for their safety, roughly 35,000 Indo–Fijians fled the country. *See* U.S. State Department, *Background Notes: Fiji*, May 1996 (last visited Sept. 8, 2000); *http://www.state.gov/www/background_notes/fiji_0596_bgn.html*

Abdul Gafoor was one of those. At the time of the coups, he was a police officer in Fiji with eighteen years experience. Born in Fiji to Indian parents, he was one of the few Indo–Fijians on the country's police force. One day in October 1987, he was on patrol when he heard screams in a nearby street and came upon a man in civilian clothing who was raping a 13–year–old girl. Gafoor arrested the man and escorted him to the police station, but his supervisor, an ethnic Fijian, explained that the man was a high-ranking army officer. The man was then released without being charged, and the supervisor warned Gafoor that his life was in danger.

The next night, the army officer he had arrested came to Gafoor's house with seven or eight other men, all dressed in army uniforms. They beat Gafoor in front of his wife and children and took him to an army camp in Nambala, where he was locked up for one week. During his captivity, several soldiers came to his cell and hit him in the stomach. They asked him why he had arrested an army officer, and they warned him not to tell anyone about the rape or his beating. They also accused him of opposing the army.

After he was released, Gafoor received treatment for his injuries and was transferred temporarily to a job as a court bailiff so that he could recover. Several nights later, he resumed his regular patrol duties and was walking down the street when a military van pulled up to the curb. The army had become involved in police work following the coups, and Gafoor thought the soldiers in the van had stopped to assist him. But when they stepped out of the van, he recognized the officer he had arrested among the group. The soldiers approached, beat him with their rifles, and threatened to kill him. They told him Fiji was their country and that he "should go back to India." Then, they left him in a water ditch, bleeding and unconscious. When he awoke the next morning, he was in a hospital, where he remained for nine days.

Gafoor feared the soldiers would return to kill him, so on November 15, 1987, he fled with his family to Canada. He stayed there until February 1991, when he entered the United States. The INS instituted deportation proceedings against Gafoor and his family in January 1993. He then applied for asylum and withholding of deportation. At his hearing before the Immigration Judge ("IJ"), Gafoor testified about the things that had happened to him. He also testified that ethnic Fijians had since taken over his house in Fiji and that he feared returning home.

The IJ denied Gafoor's application, finding that the abuse he suffered "had nothing to do with any political motives, racial motives, membership in any particular social group or religious belief or any of the other items mentioned." Instead, the IJ concluded, the attacks against Gafoor were motivated solely by revenge for the arrest of the army officer. The BIA affirmed this decision in September 1998, finding "no nexus between the incidents . . . and any ground protected by" the Immigration and Nationality Act. The BIA also ruled that even if Gafoor had been persecuted on account of a protected ground, country conditions had changed sufficiently to rebut the presumption of a well-founded

fear. Gafoor then filed a timely petition for review of the BIA's decision.

## II. STANDARD OF REVIEW

"We must uphold the BIA's determination that an alien is not eligible for asylum if it is supported by reasonable and substantial evidence based on the record as a whole." *Maini v. INS*, 212 F.3d 1167, 2000 WL 640352 (9th Cir. May 19, 2000). "Put differently, we will reverse its decision only if the petitioner can demonstrate that the evidence is 'such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed.'" *Id.* (quoting *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)).

## III. ANALYSIS

### A. *Past Persecution*

■ To establish eligibility for asylum, an applicant must show a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1158(b)(1); 8 U.S.C. § 1101(a)(42)(A). If an applicant demonstrates past persecution on account of one of these protected grounds, there is a presumption of a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b)(1)(i); *Garrovillas v. INS*, 156 F.3d 1010, 1016 (9th Cir.1998). The burden then shifts to the INS to show by a preponderance of the evidence that country conditions have changed to such an extent that the presumption of a well-founded fear is no longer valid. *See Garrovillas*, 156 F.3d at 1017.

■ The BIA did not dispute that Gafoor was persecuted, and we think it clear he was. Soldiers assaulted him in front of his family, held him captive for a week, then beat him on the street until he was bleeding and unconscious. Such appalling treatment easily qualifies as persecution under our case law. *See e.g., Korablina v. INS*, 158 F.3d 1038, 1044–45 (9th Cir.1998)

(finding that applicant suffered persecution where she witnessed a violent attack on her boss, was tied to a chair with a noose around her neck, and was threatened with death); *Surita v. INS*, 95 F.3d 814, 819 (9th Cir.1996) (finding that applicant was persecuted where soldiers robbed her every day for a week, looted her family's house at gunpoint, and threatened to kill and rape her if she reported the robbery to police).

■ The more pointed question is whether Gafoor was persecuted *on account of* his race, religion, nationality, membership in a particular social group, or political opinion. This question goes to the motives of his persecutors, and as we have long recognized, motives can be difficult to pin down. *See Ramirez Rivas v. INS*, 899 F.2d 864, 869 (9th Cir.1990) ("Evidence of the motive of a persecutor is hard to come by."). Persecutors do not always take the time to tell their victims all the reasons they are being beaten or kidnaped or killed. Sometimes, they may not want their motives known for fear of public condemnation; other times, the motives may be so clear to both parties that no explanation is needed.

■ Because it is so difficult to prove motives with any precision, the Supreme Court teaches that an applicant does not have to provide direct evidence that his persecutors were motivated by one of the protected grounds; instead, compelling circumstantial evidence is sufficient. *See Elias–Zacarias*, 502 U.S. at 483, 112 S.Ct. 812. In addition, in *Borja v. INS*, 175 F.3d 732, 736 (9th Cir.1999) (en banc), we held that an applicant need not show that his persecutors were motivated solely by a protected ground. Nor does an applicant have to prove that the protected ground, by itself, would have led to the persecution. Rather, an applicant need only "produce evidence from which it is reasonable to believe that the harm was motivated, at least in part, by an actual or implied protected ground." *Id.* (internal citation omit-

ted); *see Hernandez–Montiel v. INS*, 225 F.3d 1084, 1095–96 (9th Cir.2000) (applicant "is not required to prove that his persecutors were motivated by [a protected ground] to the exclusion of all other possible motivations"); *Singh v. Ilchert*, 63 F.3d 1501, 1509 (9th Cir.1995) ("[P]ersecutory conduct may have more than one motive, and so long as one motive is one of the statutorily enumerated grounds, the requirements [for asylum] have been satisfied.").

■ In this case, the BIA held that Gafoor was not persecuted on account of his race, religion, nationality, membership in a particular social group, or political opinion. Instead, it concluded he was targeted solely because he arrested a high-ranking army officer for the rape of a 13–year–old girl.

■ BIA determinations enjoy a healthy measure of deference, *see, e.g., Elias–Zacarias*, 502 U.S. at 483, 112 S.Ct. 812, but we cannot conclude that its decision here is supported by substantial evidence. In his testimony before the IJ, Gafoor stated that when he was locked up at Nambala, the soldiers asked him why he had arrested an army officer and accused him of opposing the army. Then, while they were beating him in the street, the soldiers told Gafoor that Fiji was their country and that he "should go back to India." Gafoor's testimony, which was accepted as true by the BIA, compels a conclusion that he was persecuted *not solely* because he arrested a high-ranking army officer, but also because of his race and the political opinion imputed to him by the soldiers. *See Sangha v. INS*, 103 F.3d 1482, 1489 (9th Cir.1997) (holding that applicant may establish eligibility for asylum on basis of imputed political opinion).

This conclusion is supported by *Surita*, 95 F.3d at 819, and *Prasad v. INS*, 101 F.3d 614 (9th Cir.1996). In *Surita*, we held that an Indo–Fijian woman who was repeatedly robbed by ethnic-Fijian soldiers had been persecuted on account of her race. To support this finding, we noted that the soldiers told Surita "they were looting her family's home because the family was of Indian descent and that Surita and her family should 'go back home' to India." *Surita*, 95 F.3d at 819. In *Prasad*, we held that an Indo–Fijian man who was jailed and beaten by ethnic-Fijian soldiers had been persecuted on account of his political opinion. There, we pointed out that the soldiers had questioned the man about his political involvement and warned him not to practice his religion in public. *See Prasad*, 101 F.3d at 616.

The evidence in this case is strikingly similar to the evidence we relied on in *Surita* and *Prasad*. In particular, the soldiers' statement that Gafoor should "go back to India" is nearly identical to the soldiers' statement in *Surita* that she and her family should " 'go back home' to India." Although the soldiers in *Surita* went one step further and said they were looting the house because her family was Indo–Fijian, that fact is insufficient to distinguish the two cases. The soldiers made clear to Gafoor that his race *and* imputed political opinion contributed to their hatred of him and provided them with additional motive for their actions.[3] That they did not tell him specifically that they were motivated by these factors is unimportant. As noted above, an applicant need not present direct evidence of a persecutor's motives if there is circumstantial evidence. *See Elias–Zacarias*, 502 U.S. at 483, 112

---

3. The dissent separates these two elements, as if there was no relation between the soldiers' hatred of Gafoor's race and the political opinion they imputed to him. Of course, the two are intimately connected. The 1987 coups were staged by the ethnic Fijian military to ensure the dominance of ethnic Fijians. To be Indo–Fijian was, by definition, to be op-

posed to this political coup. The dissent is therefore mistaken when it asserts that the soldiers' statement to Gafoor about his political opinion must be "taken alone." (Dissent at 660). To the contrary, the statement must be taken together with the soldiers' statements about Gafoor's race.

S.Ct. 812; *Chand v. INS,* 222 F.3d 1066, 1078 (9th Cir.2000). And the soldiers' statements to Gafoor are unmistakable circumstantial evidence that they were motivated by his race and imputed political opinion. *See Yazitchian v. INS,* 207 F.3d 1164, 1167–68 (9th Cir.2000) (evidence that government agents accused petitioner of providing weapons to opposition party, called him a "Dashnak," and told him to leave Armenia compelled conclusion that he was persecuted on account of an imputed political opinion).

The soldiers in this case were, to be sure, activated by the arrest of the army officer. They specifically questioned Gafoor about the arrest and warned him not to tell anyone about the rape. As we explained in *Borja* and have repeated in numerous cases, however, asylum may be granted if the persecution "was motivated, at least in part, by an actual or implied protected ground." *Borja,* 175 F.3d at 736; *see e.g., Hernandez–Montiel,* 225 F.3d at 1095–96; *Tarubac v. INS,* 182 F.3d 1114, 1119 (9th Cir.1999); *Singh,* 63 F.3d at 1509–10. The evidence presented by Gafoor leaves no doubt that the soldiers were motivated, at least in part, by his Indian background and by his purported opposition to the army. Their message to Gafoor was clear: he had, by simply doing his job as a police officer, challenged the notion that ethnic Fijians were above the law. The soldiers' statements were not "off-the-cuff" remarks or "vague accusation[s]" uttered incidentally.[4] (Dissent at 658–59). They were pointed and specific statements made during two brutal beatings that reveal much about the motivation of those who made them, particularly when considered in the context in which they were made.

The dissent disregards that context, reading the evidence like a single scene torn out of a play. But if we are to understand what motivated Gafoor's persecutors, we must consider the entire story. The soldiers were ethnic Fijians engaged in a military coup to depose an elected Indo–Fijian government, to subordinate Indo–Fijians politically and culturally, and to physically punish those perceived as standing in their way. When Gafoor arrested a high-ranking officer for raping a 13–year–old girl, they did not just warn him to mind his own business. He was taken to a military camp, as were many other Indo–Fijians, and held prisoner for a week while questioned about the arrest and accused of opposing the army. Then, after he was released, the soldiers came back to beat him some more, telling him that Fiji was their country and that he should "go back to India." They did all this in spite of the fact that the officer had been released and was not charged with any crime. When the case is viewed in this context, a reasonable fact-finder could not conclude that Gafoor's persecution was motivated solely by a personal vendetta. The evidence compels a conclusion that he was persecuted, at least in part, on account of his race and an imputed political opinion.

In light of the dissent's suggestion that our reasoning is not "serious" (Dissent at 659), we now explain why our reading of *Borja* is correct and why we think Judge O'Scannlain, who dissented from the en banc opinion in *Borja* as well, is incorrect.

Judge O'Scannlain argues that *Borja* does not relieve an applicant of the burden of proving that a protected ground "*actu-*

---

**4.** Nor were the remarks merely "sarcastic derision," as the dissent suggests. (Dissent at 659 n. 1). And the dissent's contention that we should view these bigoted slurs in the same manner as a joke made by James Bond while fighting a cigarette smoker is disturbing, to say the least. Movies—especially of the James Bond type—are made to entertain, and we laugh at a remark by James Bond because we know we are watching a movie. But even taking the analogy seriously, the reasoning is unpersuasive. While we might not construe Bond's comment about cigarette smoking as evidence of his motive, if he called an Irish Republican a "mick," we might well think he was motivated, at least in part, by the race and politics of the Republican.

*ally* motivated" the persecution. (Dissent at 660). In other words, he appears to argue, if there is evidence of two motives—one that is related to a protected ground and one that is not—the applicant must show persecution solely on the basis of the former motive. Judge O'Scannlain says the *Borja* court did not address this requirement, but that it did not matter anyway because the petitioner's political opinion was clearly "the sufficient and primary cause" of her persecution. (Dissent at 661).

A careful reading of *Borja* undermines this argument. The petitioner in *Borja* was approached by guerillas who asked her to join their effort to overthrow the government. *See Borja*, 175 F.3d at 734. She refused, telling them she was pro-government and would not enlist. When they became angry and pointed a gun at her, she quickly suggested that she pay a revolutionary tax instead. The guerillas agreed, and for the next three months, she paid a tax of 3,000 pesos. *See id.* at 735. But the guerillas soon demanded 6,000 pesos a month, and when the woman explained that she could not afford that amount, they beat her, put a gun to her head, and slashed her with a knife. They also told her she would be killed if she did not give them the money. Fearing for her life, the woman left the country soon afterward. *See id.*

The BIA denied the petition for asylum in *Borja*, holding that the petitioner there was persecuted solely because the guerillas wanted to extort money. We reversed en banc, acknowledging that the woman's beating was motivated partly by economic factors, but concluding that "only by closing one's eyes to the escalating nature of this confrontation could one see the ensuing events as strictly economic with no political component." *Id.* at 737. We also stated that "[h]ad she joined the NPA's cause, it is unreasonable to assume they would have slashed her shoulder and

drawn her blood when she could not produce 6,000 pesos on demand." *Id.* at 736–37.

This examination of *Borja* makes clear that an applicant need not show that a protected ground, standing alone, would have led to the persecution. The guerillas in *Borja* had two motives: they wanted money from the petitioner, and they wanted to punish her for a political opinion. But it was only when she could no longer afford to pay the tax that they persecuted her. Thus, the woman could not prove—and we did not require her to prove—that the guerillas would have persecuted her on the basis of her political beliefs alone. Instead, we simply required her to show that her persecutors were motivated, at least in part, by her political beliefs. It is only Judge O'Scannlain, here and in his *Borja* dissent, who would require more.

Judge O'Scannlain argues in essence that an action cannot be "on account of" some factor unless the factor, by itself, was sufficient to bring about the action. (Dissent at 661). But the Supreme Court has explicitly rejected such a rigid approach to causation. For example, Title VII forbids an employer from making an employment decision "because of" an employee's race, color, religion, sex, or national origin.[5] *See* 42 U.S.C. § 2000e–2(a)(1). Employees have never been required to prove, however, that their race or sex, standing alone, would have led to the adverse employment decision. Instead, in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 242–44, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the Supreme Court said that in mixed motive cases an employee need only show that an employer would not have made the same decision in the absence of the discriminatory motive.

The Civil Rights Act of 1991 changed the standard adopted by *Price Waterhouse*, but only to make the plaintiff's case easier. Under the Act, a plaintiff can prevail in a Title VII case if he can show that

---

5. The dictionary defines "because of" as "on account of" and vice versa. *See The Ameri-* *can Heritage Dictionary* 72, 166 (2nd ed. 1991).

"race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). Evidence that an employer would have taken the same action in the absence of the discriminatory motive does not eliminate liability, but only limits the types of relief a court may order. *See* 42 U.S.C. § 2000e–5(g)(2)(B); *see also Washington v. Garrett,* 10 F.3d 1421, 1433 n. 15 (9th Cir.1993); *Pilditch v. Bd. of Education,* 3 F.3d 1113, 1118 n. 2 (7th Cir. 1993). Thus, Congress has made clear that a person may act "because of" a discriminatory factor even though other factors also motivated the action, and even if the action would have been taken in the absence of the discriminatory factor.

Judge O'Scannlain offers no reason for imposing a higher burden on asylum applicants than on employees in Title VII cases. Indeed, the equities cut the other way. An employee at least has the opportunity to gather evidence of the employer's motive and to put the employer on the stand to explain the reasons behind the employment action. The evidentiary obstacles for asylum applicants, by contrast, are enormous. "Persecutors," we have stated, "are hardly likely to provide their victims with affidavits attesting to their acts of persecution." *Bolanos–Hernandez v. INS,* 767 F.2d 1277, 1285 (9th Cir.1984). Nor are they likely to submit declarations explaining exactly what motivated them to act. And individuals fleeing persecution do not usually have the time or ability to gather evidence of their persecutors' motives. It is unreasonable, therefore, to require asylum applicants to show that a protected ground, standing alone, would have led to their persecution, or even to require a showing that the persecution would not have occurred in the absence of a protected ground. The reasonable approach is the one adopted by *Borja:* a petitioner must show that his persecutors were motivated, at least in part, by a protected ground. Because Gafoor has met that burden overwhelmingly, the BIA's conclu-

sion is not supported by substantial evidence.

### B. *Changed Country Conditions*

The BIA ruled that even if Gafoor established a presumption of a well-founded fear, this presumption was rebutted by changed country conditions in Fiji. To support this finding, the BIA cited the Department of State country report for 1992, which reported that political killings had ceased, freedom of speech and religion had been restored, political participation had been revived, and Indo–Fijians had been elected to government offices. Although the report also noted that Indo–Fijians are subject to occasional harassment and crime on account of their race, it concluded that "there are no credible allegations of government involvement in such incidents."

Ordinarily, we would accept the BIA's finding of changed country conditions as long as it was not undermined by evidence in the record. But recent events have rendered the State Department's 1992 country report hopelessly out of date and have made it impossible to ignore the dangers faced by Indo–Fijians in Fiji. On May 19th, 2000, the one-year anniversary of the election of the first Indo–Fijian prime minister, a group of armed Fijian nationalists stormed the country's Parliament and seized the prime minister and his cabinet. *See For the Second Time: An Attempted Coup in Fiji,* The Economist, May 27, 2000, *available in* 2000 WL 8142168. Fiji's president, Sir Kamisese, declared a state of emergency, and ethnic-Fijians pillaged the city center, looting mainly Indian shops. *See id.*

Since that time, all progress made in Fiji toward eliminating racial conflict has been undone. The commander of the Fijian army declared martial law and conceded to the demands of the Fijian nationalists, who are led by a disgruntled former government official named George Speight. *See The Trouble Ahead: Fiji's*

*Damaged Economy,* The Economist, June 3, 2000, *available in* 2000 WL 8142201. The elected Indo–Fijian government was ousted, the country's 1997 constitution, which gave increased rights to Indo–Fijians, repealed, and the army commander, Frank Bainimarama, installed himself as head of state. *See id.* Meanwhile, the prime minister and thirty other government officials were held hostage in Parliament, and the Indian business district was closed down as a result of looting and arson. *See id.; Fiji's Terrorists: Allow Them to Succeed, and It Could Destroy the Country,* The Economist, June 3, 2000, *available in* 2000 WL 8142205.

International condemnation of the crisis was swift and severe. Australia, Britain, New Zealand, and the United States all threatened economic sanctions and recalled their ambassadors. *See That Man Again: No respite for Fiji,* The Economist, July 22, 2000, *available in* 2000 WL 8142920. The United Nations criticized the military for failing to crack down on Speight and his allies. *See The Trouble Ahead: Fiji's Damaged Economy,* The Economist, June 3, 2000, *available in* 2000 WL 8142201.

After several months of pressure, an agreement was reached between Speight and the military. He released the prime minister and other politicians in exchange for promises of amnesty and a new constitution diminishing the rights of Indo–Fijians. Speight was later arrested for failing to return weapons he had stolen, but the new prime minister, Laisenia Qarase, appears to support his agenda. *See That Man Again,* The Economist, July 22, 2000, *available in* 2000 WL 8142920. Qarase says the new unelected government that was installed by the ethnic Fijian military will remain in power for the next three years. *See Arresting: Fiji,* The Economist, July 29, 2000, *available in* 2000 WL 8142959. And though the military has restored some degree of stability, trouble persists. Hundreds of Indo–Fijians were recently taken hostage on the island of Vanua Levu, and "sporadic attacks on ethnic Indians continue." *See* U.S. Dep't of State, *Public Announcement: Fiji,* Aug. 11, 2000 (last visit Sept. 8, 2000)*http://travel.state.gov/fiji_announce.html.* The State Department has warned United States citizens that travel to Fiji may be dangerous. *See id.*

■ These dramatic events, remarkably similar to the 1987 coups that led to Gafoor's abuse, require a reevaluation of the INS's claim that Gafoor will not face further persecution if returned to Fiji. While we do not doubt the government's good faith in relying on the 1992 country report to support its assertion, we cannot ignore the realities of the day. It is quite obvious that conditions in Fiji for persons of Indian descent are not only not improved, they are demonstrably worse. We therefore remand to the BIA to consider whether recent events in Fiji undermine the finding that Gafoor's well-founded fear of persecution is rebutted by changed country conditions.

■ We recognize that our review of BIA decisions is generally limited to the record and that it is unusual for this court to take judicial notice of events outside of the administrative record. In *Fisher v. INS,* 79 F.3d 955, 964 (9th Cir.1996) (en banc), we stated that out-of-record evidence may be considered only where (1) the BIA considers the evidence; or (2) the BIA abuses its discretion by failing to consider such evidence upon the motion of the applicant. But as we noted in *Lising v. INS,* 124 F.3d 996, 998–99 (9th Cir. 1997), there are limits to the general rule established by *Fisher.* In particular, *Fisher* related to evidentiary material that could have been, but was not, presented to the BIA. We made much of this in our opinion in *Fisher,* stating that the petitioner had "ample opportunity to request consideration" of the evidence before the BIA, but that "she failed to do so." *Fisher,* 79 F.3d at 964. We then refused to remand to the BIA "for it to consider evidence Fisher failed to present." *Id.* Here, the

out-of-record evidence of Fiji's troubled political state was not available when the BIA made its decision; indeed, the events themselves had not occurred. Therefore, we do not believe the rule laid down in *Fisher* precludes us from taking judicial notice of this evidence.[6]

■ The dissent argues that by taking judicial notice of events in Fiji, we have exceeded the bounds of this court's lawful authority. (Dissent at 662–63). However, our decision is well supported by case law. As we have previously noted, "American courts generally will take judicial notice of a state of uprising." *Quinn v. Robinson,* 783 F.2d 776, 797 n. 18 (9th Cir.1986). In addition, "[t]he Sixth Circuit consistently takes judicial notice of changed political circumstances in immigration cases." *See Ivezaj v. INS,* 84 F.3d 215, 219 (6th Cir. 1996) (taking judicial notice of persecution of Albanians by Serbs); *see also Palushaj v. INS,* No. 93–3196, 1994 WL 198169, at *2 (6th Cir.1994) (taking judicial notice of the persecution of ethnic Albanians in Kosovo); *Ivezaj v. INS,* No. 90–3980, 1991 WL 151157, at *2 (6th Cir.1991) (same); *Dalou v. INS,* No. 89–4076, 1990 WL 140540, at *5 (6th Cir.1990) (per curiam) (taking judicial notice of "recent events unfolding in Iraq and the adjacent Arabian peninsula region"); *Dawood–Haio v. INS,* 800 F.2d 90, 91 (6th Cir.1986) (taking judicial notice of the Iran–Iraq war).

The Seventh and Fifth Circuits also have taken judicial notice of political developments subsequent to the BIA's decision.

*See Kaczmarczyk v. INS,* 933 F.2d 588, 594 n. 4 (7th Cir.1991) ("We exercise our discretion to take judicial notice of further changes in Polish politics that occurred between the time of the BIA's decision and our review."); *Coriolan v. INS,* 559 F.2d 993, 1002–04 (5th Cir.1977) (relying on Amnesty International report not part of administrative record to remand for reconsideration). And in a habeas corpus proceeding brought by an asylum applicant, we took judicial notice of changes in Haiti that occurred after the applicant's hearing before an immigration judge. *See Desir v. Ilchert,* 840 F.2d 723, 730 (9th Cir.1988).

■ We do not exceed our authority by taking judicial notice of dramatic foreign developments because our action does not usurp the authority of the administrative agency. This is not a situation where an agency provided the parties an opportunity to place their evidence in the record, and we have undermined the agency's control over the case by allowing the parties to supplement that record. Here, we have simply introduced into the record facts that were not available earlier, a step that in no way diminishes agency control over the case. Indeed, we return the matter to the agency for it to determine the impact of these dramatic recent events.

Contrary to Judge O'Scannlain's suggestion, we do not hold that "any perceived change in country conditions" justifies the court in taking notice of current events. (Dissent at 662–63). We simply conclude that the events in Fiji are so troubling, so

---

6. In recent cases, we have made clear that on remand the BIA may not look beyond the existing record to determine whether changed country conditions rebut the presumption of a well-founded fear of future persecution. In fact, we have refused to remand where the petitioner is entitled to a determination of eligibility on the existing record. *See, e.g., Chand,* 222 F.3d at 1077–78; *Navas v. INS,* 217 F.3d 646, 662–63 (9th Cir.2000). The reason for this rule is that a petitioner who was eligible for asylum when the BIA considered his case does not lose that eligibility as a result of the agency's failure to recognize it. Where the petitioner properly established his

eligibility on the record made before the BIA, that eligibility must be accorded its proper legal effect.

However, the core purpose of our asylum law would be undermined were we to bar petitioners from showing that as a result of changes that have occurred while their cases were being reviewed, they face persecution or death. If an alien faces such a fate as a result of current conditions in his country, we do not return him to that fate simply because conditions at some earlier time might not have satisfied the requirements for establishing asylum eligibility.

well publicized,[7] and so similar to the earlier coups that we would be abdicating our responsibility were we to ignore the situation.

Judge O'Scannlain also criticizes us for failing to give the INS an opportunity "to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed." (Dissent at 662–63). However, the very case he cites for support states that a "court may take judicial notice of facts without prior notification to the parties, so long as the court subsequently provides an opportunity to rebut the noticed facts...." *Gomez–Vigil v. INS*, 990 F.2d 1111, 1115 (9th Cir.1993) (Aldisert, J., concurring). The INS will have ample opportunity to present evidence of the most current conditions in Fiji and to demonstrate, if it is able, that Gafoor is not eligible for asylum.

Finally, the dissent argues that we make no effort to evaluate the relevance of these noticed facts to Gafoor's case. (Dissent at 663). But it should be obvious why we have not undertaken this investigation. The BIA is better equipped to conduct this factual inquiry than an appellate court. And if the BIA determines that the troubles in Fiji pose no threat to Gafoor, and if that determination is supported by substantial evidence, we will not disturb it. But simply because the BIA is in a better position to evaluate the relevance of recent events to Gafoor's case, it does not follow that we should close our eyes entirely. When a foreign crisis erupts that is as serious and well-documented as the one in Fiji, we have a duty to bring it to the BIA's attention.

PETITION GRANTED. REMANDED WITH INSTRUCTIONS.

O'SCANNLAIN, Circuit Judge, dissenting:

Under the Immigration and Nationality Act, Gafoor and his family are eligible for asylum only if he has at least a "well-founded fear" that returning to Fiji would result in his "persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Because the motive of Gafoor's potential tormentors is "critical" under the terms of the Act, "he must provide some evidence of it, direct or circumstantial," in his asylum application. *INS v. Elias–Zacarias*, 502 U.S. 478, 112 S.Ct. 812, 817, 117 L.Ed.2d 38 (1992). Indeed, as the Supreme Court has taken pains to remind us, because Gafoor "seeks to obtain judicial reversal of the ... determination" of the Board of Immigration Appeals ("BIA") that he has failed to show that he would risk persecution on account of one of the five grounds enumerated in the Act, he now "must show that the evidence he presented [to the BIA] was so compelling that *no reasonable factfinder* could fail to find" otherwise. *Id.* (emphasis added).

After a hasty acknowledgment of the formidable barriers to granting Gafoor relief, the majority grants it nevertheless. In doing so, the majority over-reads our decision in *Borja v. INS*, 175 F.3d 732 (9th Cir.1999) (en banc), to effect exactly the

---

7. Contrary to the dissent's suggestion that everything we know about Fiji was learned from The Economist, events in Fiji have been widely covered and reported upon. *See, e.g.,* Andrew West, *Ousted Fijian Leader Enlists Support*, Christian Science Monitor, August 22, 2000, *available in* 2000 WL 4430421; Pattrick Smellie, *Deposed Prime Minister Mahendra Chaudry: Democracy's Voice*, Time International, August 21, 2000, *available in* 2000 WL 25226847; George Wehrfritz, *Fiji Takes a Step Backwards*, Newsweek International, August 7, 2000, *available in* 2000 WL 9728384;

*New Fijian President Is Reported Ill, and Swearing-in Is Delayed*, The New York Times, July 19, 2000, at A5; Kevin Whitelaw, *Troubles in Paradise, Guns in the Sun*, U.S. News & World Report, June 19, 2000, *available in* 2000 WL 7718161; Sam Howe Verhovek, *Burst of Ethnic Tension in Fiji Threatens South Seas "Eden"*, N.Y. Times, June 7, 2000, *available in* 2000 WL 23201800; Murray Mottrom, *Speight Has Learned An Old Lesson Well*, Sydney Morning Herald, June 3, 2000, *available in* 2000 WL 21025630.

658

sort of judicial usurpation which the Supreme Court intended to forestall in *Elias–Zacarias*. As if this did not constitute sufficient arrogation of the Attorney General's province, the majority also declares that this court can compel, *sua sponte*, a reopening of an asylee's case whenever it concludes that conditions in his home country may have changed subsequent to the BIA's adverse decision. This novel assertion conflicts with a plain holding of our court sitting en banc. I respectfully dissent.

I

Gafoor is a police officer who arrested a man he caught in the act of attempting to rape a thirteen-year-old-girl. The man turned out to be a high-ranking officer in the Fijian army who was, apparently as a result, promptly released. The next night, the same officer invaded Gafoor's house with seven or eight uniformed men. The men beat Gafoor and took him to a military compound where they questioned him over the ensuing week about the arrest of the army officer and warned him not to testify against the officer or tell anyone else about the attempted rape. At some point in his incarceration, the army officer's confederates also accused Gafoor of being "against the army." Some time after Gafoor had recovered from his beating and incarceration, the army officer whom he had arrested led several men in another assault on Gafoor as he patrolled a public street. During the assault, one of the men told Gafoor that he "should go back to India."

This course of events, which represents the sum of Gafoor's factual testimony, establishes fairly plainly that the army officer orchestrated the attacks on Gafoor purely as reprisals for his arrest and vivid warnings of what would befall Gafoor if he ever disclosed the facts surrounding it. This is, appropriately enough, precisely what the immigration judge ("IJ") and the BIA concluded. There is no dispute that this conclusion renders Gafoor ineligible

for asylum under the Act, for reprisal and intimidation are not among the five cognizable grounds for persecution.

In granting Gafoor's petition for review, however, the majority contends that these events establish that Gafoor's assailants had motives other than reprisal and intimidation. In particular, the majority asserts that the vague accusation that Gafoor "oppos[ed] the army" and the slur to the effect that Gafoor "should go back to India" "compel[ ] a conclusion that he was persecuted *not solely* because he arrested a high-ranking army officer, but also because of his race and the political opinion imputed to him by the soldiers." *Supra* at 651. Given that the evidence fails on the whole to do anything more than *suggest* that Gafoor's imputed political opinion and race actually animated his assailants' attacks, I think preposterous the majority's implicit contention that "a reasonable factfinder would *have to* conclude" that the evidence *established* as much. *Elias–Zacarias*, 502 U.S. at 481, 112 S.Ct. 812 (emphasis added).

A

The majority argues that the off-the-cuff accusation and slur emitted by Gafoor's assailants amount to proof of enumerated motives by analogizing Gafoor's case to those of the successful petitioners in *Surita v. INS*, 95 F.3d 814 (9th Cir.1996), and *Prasad (Gaya) v. INS*, 101 F.3d 614 (9th Cir.1996). *See supra* at 651. There are, however, important distinctions between those cases and Gafoor's.

In *Surita*, the petitioner, an Indo–Fijian woman, was robbed twice daily by ethnic Fijians as she went to and from work. Her house was also looted by ethnic Fijian soldiers who "stated that they were looting the family's home because the family was of Indian descent" and "told Surita that the family's possessions belonged to ethnic Fijians." *Surita*, 95 F.3d at 818, 819. On another occasion, the petitioner's Hindu temple was desecrated and she and her

mother were robbed attempting to worship at another place. Under these circumstances, we concluded that a reasonable factfinder would have had to conclude that the petitioner had "suffered past persecution on account of race." *Id.* at 820.

Our holding in *Surita* cannot compel the conclusion that Gafoor was persecuted on account of race. Unlike the petitioner's case in *Surita*, Gafoor's assailants never declared that Gafoor was being assaulted *because* he was Indo–Fijian–they simply belittled him as an Indo–Fijian during their attack. The majority holds that this difference is "insufficient to distinguish the two cases," because, with their derision, "[t]he soldiers made clear to Gafoor that his race *and* imputed political opinion contributed to their hatred of him and provided them with additional motive for their actions." *Supra* at 651. According to the majority, the fact that the soldiers "did not tell him specifically that they were motivated by these factors is unimportant." *Surita* differs from the present case, the majority contends, merely because the petitioner in *Surita* presented direct evidence of her persecutors' motivations, whereas Gafoor presented circumstantial evidence. *See supra* at 651–52.

The majority is simply wrong. The two cases fundamentally differ with respect to the ultimate issue that the evidence in question proves. In *Surita*, the petitioner presented unrefuted evidence of an actual causal connection between her race and her persecution. But for her race, her attackers would have left her alone. Here, Gafoor has made no such showing. He has merely presented evidence that the soldiers taunted him with a racial slur during the course of an attack prompted

by a personal vendetta. Taunting or degrading an opponent by referring to one or another of his traits hardly makes "clear" that the trait has any causal significance— indeed, the trait may be wholly irrelevant to any actual difference of opinion.[1] The majority cannot be serious in holding that the utterance of such a racial slur not only *suggests* that a contemporaneous assault is racially motivated but *compels that conclusion.*

Nor does our decision in *Prasad* establish that a reasonable factfinder would have to conclude that Gafoor was persecuted on account of a political opinion imputed to him. The petitioner in *Prasad* was a local delegate of the Hindu-dominated Labor Party who was dogged by native Fijian military officers following the 1987 coup. *See id.* at 616. He was twice incarcerated and, "during his detention[,] ... was questioned about his involvement with the ousted Labour Party." *Id.* The military also attempted to prevent the petitioner "from meeting in groups" with other Hindus. *Id.* We concluded that the petitioner had "established past persecution on account of his political activity." *Id.* at 617.

Compared to the petitioner in *Prasad*, Gafoor has presented scant evidence that his political opinion (imputed or otherwise) actually motivated his tormentors. The majority implicitly relies on the fact that at least one of Gafoor's jailers accused him of being "against the army." *See supra* at 651 ("In his testimony before the IJ, Gafoor stated that when he was locked up at Nambala, the soldiers asked him why he had arrested an army officer and accused him of opposing the army."). This fact is certainly *suggestive*, but taken alone—as it must be, for in this regard it *is* alone—it can *compel* at most the uninteresting con-

---

**1.** This principle is so self-evident and intuitive that Hollywood routinely applies it for mass amusement: Sarcastic derision is frequently deployed in the dialogue of action movies to insinuate comic relief into even the most violent of confrontations between mortal enemies. For example, in the opening scene of *Tomorrow Never Dies,* super-agent James

Bond is infiltrating a terrorist arms bazaar. He incapacitates a cigarette-smoking henchman while superciliously muttering the line: "Filthy habit." *Tomorrow Never Dies* (United Artists 1997). Despite the pointed reference, only the hopelessly obtuse would maintain that Bond dispatched the gun-toting smoker "on account of" his tobacco use.

clusion that the accuser believed Gafoor to be opposed to the army. This is particularly so because the role of the unnamed accuser in the assaults on Gafoor is unknown and may well have been entirely peripheral.

Simply put, the facts that Gafoor's assailants told him to go back to India and that an officer in the jail accused him of opposing the army do not *compel* the conclusion that Gafoor's assailants were motivated by Gafoor's race or political opinion. Nor would they be compelling even if we were to interpret these facts, as the majority insists, within the political "context" that the majority develops from sources wholly outside the administrative record, a "context" that *Fisher v. INS,* 79 F.3d 955, 964 (9th Cir.1996) (en banc), in fact prohibits us from considering. No decision of this court suggests otherwise. The majority thus oversteps its bounds in reversing the BIA's decision.

### B

Reality is that policeman Gafoor was persecuted because he caught a powerful military figure *in flagrante delicto* and dared to arrest the officer whom he witnessed in the criminal act of attempting to rape a young girl. No one thinks otherwise, not even the majority, which concedes that the soldiers were "activated" by the arrest. The fundamental problem, therefore, with the majority's conclusion that Gafoor was indubitably persecuted "on account of" his race and imputed political opinions is not really that the facts pointing thereto are less informative in this case than they were in *Surita* and *Prasad.* Indeed, at his hearing Gafoor himself unfailingly attributed his persecution, in the final calculus, to his arrest of the officer:

> IJ: Did they tell you why they were beating you up?

Gafoor: They thought, they thought that I had sent some kind of enemy with them.

IJ: Some kind of what?

Gafoor: Enemy. Uh, they said that they were going to kill me and, and they were going to kill my family.

IJ: Why?

Gafoor: Because I arrested them.

> \*     \*     \*

IJ: Why? Wait a minute. Why did you think they took you to the military camp? Why do you think you were arrested?

Gafoor: They said that we have some kind of enmity with each other but I—They said that we police officers, we don't like the army but it was—they said they were going to kill me and destroy us and he beat me.

IJ: Did he tell you why they thought you, there was some kind of enmity between the Army and the police?

Gafoor: He said why I was arresting the Army officer. I didn't know.

> \*     \*     \*

Hiester:[2] As far as you know, he was never charged with the crime?

Gafoor: If they would have charged him with the crime, then nothing would have—then they wouldn't have done to me what, what they did to me.

Hiester: If he was not charged with the crime, why was the military so interested in you?

Gafoor: They were angry with me.

Hiester: About what?

Gafoor: Because I arrested an Army officer.

The majority implies that the undisputed fact that Gafoor's *arrest* of the army officer caused his persecution is irrelevant

---

**2.** Thomas L. Hiester was the attorney of record for Gafoor.

because we held in *Borja* "that asylum may be granted if the persecution 'was motivated, at least in part, by an actual or implied protected ground.'" *Supra* at 652 (quoting *Borja*, 175 F.3d at 736). The majority is mistaken. The fact that an act of abuse may be "motivated" by two or more distinct considerations does not dispense with the logical requirement that any single factor *actually* "motivated" the conduct.

This requirement, I would be the first to acknowledge, is not easily satisfied. Concluding that something actually "motivated" a human being to act is often not only speculative but conceptually challenging. Is a situational factor that makes a person's action more likely to occur than it otherwise would be a "motive"? What if only infinitesimally more likely? Is a factor a "motive" when it is sufficient to incite an action but does not make that action more likely to occur at all (because the action will certainly occur anyway)?

Answering these questions and marshaling evidence to categorize situational factors as precisely as the resulting answers may demand requires a degree of inferential hair-splitting that the majority in *Borja* did not, and indeed did not need to, address. The majority concluded that there could be little doubt that the petitioner's announced opposition to the New People's Army ("NPA") was the sufficient and primary cause that "triggered" the NPA agents' extortion and ensuing attack on her. *See Borja*, 175 F.3d at 736, 737 ("Had she not interjected her willingness to pay, the evidence strongly suggests that the NPA would have taken her life as a response to her political statement.").

Unlike the facts of *Borja*, the facts of this case plainly indicate that the petitioner would not have been persecuted absent a motive that is not enumerated in the Act—that is, Gafoor would never have been persecuted if he had not arrested the army officer. This case thus requires us to determine just how causally significant a factor must be for us to conclude that it

is a "motive" for purposes of the Act. It is apparent that for the majority, a motivating factor need not have any causal significance at all. The majority claims that persecution may be "on account of" a protected ground even if the protected ground is neither a sufficient nor even a necessary cause of the persecution. *See supra* at 653 ("It is unreasonable, therefore, to require asylum applicants to show that a protected ground, standing alone, would have led to their persecution, or even to require a showing that the persecution would not have occurred in the absence of a protected ground."). The majority's definition of "motive" remains elusive, but it is apparent that it does not comprehend the concept of causation.

In dispensing with a causation requirement, the majority wilfully disregards the well-settled law of this court. We have regularly rejected the proposition that prosecutory conduct is "on account of" a statutorily protected characteristic just because the presence of that characteristic enhanced the probability that the persecutor conduct would occur. *See, e.g., Singh v. INS*, 134 F.3d 962, 970 (9th Cir.1998) (acknowledging that ethnic Fijians were known to commit crimes against Indo–Fijians because of their race but rejecting the petitioner's allegation that crimes committed against her by persons who may have been ethnic Fijians were "on account of" her race); *Sangha v. INS*, 103 F.3d 1482, 1490 (9th Cir.1997) (noting that, even if guerrillas had imputed opposing political opinion to petitioner, there was "no evidence" that the guerrillas' persecution of him was "'on account of' [his] political views").

The majority seemingly feels that it would be unfair to require asylum applicants actually to demonstrate that they were persecuted "on account of" a protected ground. Causation, after all, is a tricky business and can raise difficult evidentiary obstacles. Congress has lowered the burden for Title VII plaintiffs; why shouldn't *we*, the majority asks, lower the burden for

asylum applicants? In the face of the extravagance and impertinence of this argument, is it too pedestrian to explain that Congress has already weighed the relevant policy choices and decided to require asylees to demonstrate that they suffered persecution "on account of" a protected ground? Of course, it is for Congress alone to decide whether to lower the burden as it has done for Title VII plaintiffs, in contrast to asylum applicants.

The evidence in this case and the history of Fiji developed outside the record do nothing to suggest—much less conclusively establish—that Gafoor's race had anything to do with the violence he suffered. The majority does not, and indeed cannot, contend that he would have been treated any differently were he an ethnic Fijian. He has plainly failed to show that his persecution was "on account of" his race or imputed political opinion, as that term has been interpreted time and again by this court.

## II

In addition to reversing the BIA's determination that Gafoor has not demonstrated past persecution on account of a statutorily enumerated ground, the majority proceeds to reject the BIA's determination that a change in country conditions refutes any supposition that Gafoor has a well-founded fear of persecution in the future. The majority observes that country conditions have changed yet again since the BIA made its determination, *see supra* at 654 ("Since that time, all progress made in Fiji toward eliminating racial conflict has been undone."), and remands for the BIA to consider changes in country conditions as of, one is left to imagine, right now. The majority bases its disregard for the BIA's determination not on anything in the record (because there is no support there) but on post-hearing magazine articles. The majority acknowledges but essentially disregards the fact that we have held explicitly that "we are limited to reviewing the

facts considered by the Board" and "are *statutorily prevented* from taking judicial notice" of evidence from outside the administrative record in reviewing asylum claims. *Fisher v. INS*, 79 F.3d 955, 963 (9th Cir.1996) (en banc) (emphasis added).

The majority attempts to skirt our plainly controlling decision in *Fisher* by relying on a particularly broad dictum from *Lising v. INS*, 124 F.3d 996 (9th Cir.1997). *See supra* at 655 ("In particular, *Fisher* related to evidentiary material that could have been, but was not, presented to the BIA.") (citing *Lising*, 124 F.3d at 998). *Lising*, given a fair reading, stands only for the proposition that we may take judicial notice of extra-record INS forms that rest in official INS files. *See* 124 F.3d at 998 ("*Fisher* does not treat the issue of a court's taking judicial notice of the agency's own records—and particularly of an official INS form that serves as the very basis of the BIA's decision."); *cf. id.* at 999 (Boochever, J., concurring) ("While I agree that almost all rules may be subject to exceptions for unforeseen contingencies, I do not believe that it is necessary in this case to carve even the *narrow* exception to *Fisher v. INS* proposed by the majority." (citation omitted) (emphasis added)). Whatever the merit of *Lising*,[3] it hardly supports the majority's claim that any perceived change in country conditions nullifies the BIA's otherwise valid determination.

In taking judicial notice of recent developments in Fiji as reported in several magazine articles, matters entirely outside the record, the majority has plainly exceeded the bounds of this court's authority as a reviewing court under the law of this circuit. *See Fisher*, 79 F.3d at 963; *see also Gomez–Vigil v. INS*, 990 F.2d 1111, 1113 (9th Cir.1993) (because "'this court does not sit as an administrative agency for the purpose of fact-finding in the first instance'," it "must reject petitioners' im-

---

**3.** This is slight, given that the analysis rested on the hoary jurisprudential proposition that

a precedent of this court is only as applicable as a later panel cares to allow.

plied request that we consider news articles and other materials appended to the briefs that were not part of the administrative record.") (quoting *Tejeda–Mata v. INS*, 626 F.2d 721, 726 (9th Cir.1980)). But the majority does not stop there. The majority relies upon articles that appeared six months after this case was argued and submitted, let alone almost two years after the BIA's decision was filed. Federal Rule of Evidence 201(e), which governs judicial notice, provides that a party must be afforded "an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed." *See also Gomez–Vigil*, 990 F.2d at 1115 (Aldisert, J., concurring) ("A court may take judicial notice of facts without prior notification to the parties, so long as the court subsequently provides an opportunity to rebut the noticed facts ....") The majority deprives the INS of any opportunity to respond, before *this* court, to its unwelcome excursus on recent developments in Fijian politics.

Even if one were to acknowledge the lawfulness of the majority's proposed "recent events" new exception to the rule in *Fisher* and the lawfulness of the majority's manner of taking judicial notice, one would nevertheless expect such "recent events" to be at least facially relevant to the issue the BIA was deciding—otherwise, there would be a new reason to remand with every new day (or at least with every new issue of *The Economist*). And yet, we are left disappointed. Here, the majority makes almost no effort to evaluate the relevance of the "recent events" to the issue of whether Gafoor is more likely than he was in 1992 to face renewed persecution at the hands of the army officer and his personal posse, who were the only Fijians who ever molested Gafoor, even at the height of the 1987 coup. The "recent events," as it turns out, are not terribly germane.

I regret that I cannot endorse the majority's proposed "recent events" exception to *Fisher*. It is plainly contrary to that decision, and it invites precisely the sort of misapplication that the majority has engaged in here. The net effect will inevitably be to frustrate and to obstruct the enforcement of our immigration laws as judges of this court persist in attempting to grant relief that Congress has delegated exclusively to the Attorney General to grant.

### III

The BIA's dismissal of Gafoor's appeal was supported by substantial evidence and perfectly justified. Gafoor has endured dreadful misfortune, but he has not been persecuted on account of any statutorily enumerated ground. Even if he had been, nothing in the record undermines the BIA's conclusion that conditions in Fiji are now such that Gafoor need no longer fear persecution at the untrammeled hands of a vengeful army officer or any of his soulmates.

I respectfully dissent.